OPINION
{¶ 1} C.M. appeals from the judgment of the Montgomery County Juvenile Court, wherein the court found him delinquent for raping his half-brother, T.L., age 5 years. C.M. was 14 years of age at the time of the rape.
 {¶ 2} At the trial, T.L. testified that in the summer of 2005, C.M. went into his room, took down his pants, and inserted his penis into T.L.'s anus. T.L. told a friend of his sister's, his mother, a doctor, and the police about the incident. A visit to Children's Medical Center on or about June 22, 2005 resulted in no finding of abuse by the doctor. However, T.L. complained to his father of great discomfort to his anus.
 {¶ 3} At trial, T.L. repeatedly insisted that he was asleep during the assault and made an additional allegation that C.M. raped him a second time on July 3. C.M. was in the Juvenile Detention Center on July 3.
 {¶ 4} C.M. denied that he raped T.L. but offered no explanation for why T.L. might lie. To explain how five-year-old T.L. would have knowledge of anal sex, C.M. said that C.M. found a pornographic video of his mother's and T.L. watched it. C.M. admitted that T.L. has never before lied about C.M. or anyone else raping him.
 {¶ 5} In a single assignment of error, C.M. contends the trial court's judgment was against the manifest weight of the evidence. He argues that his half-brother's testimony was simply unbelievable. He notes that T.L. claimed he was sexually assaulted while he slept and that he did not wake up. He also notes that the physician who examined T.L. at the Children's Medical Center could find no evidence that T.L. was sexually assaulted.
 {¶ 6} The State argues that the judgment is not against the manifest weight of the evidence because T.L. told the same story consistently to four people, that he knew about anal sex, that he complained of anal discomfort to his father, and that C.M. admitted T.L. had never made up such stories about anyone before. Lastly, the State argues that since T.L. was five at the time of the incident, he could be confused about the dates of when they occurred.
 {¶ 7} The following is a portion of T.L.'s testimony on direct examination by the prosecuting attorney:
 {¶ 8} "Q. Right. Okay. But, when you said that he stuck his privates in your butt, were you looking away from him?
 {¶ 9} "A. Away from him.
 {¶ 10} "Q. And he was behind you? Away from him?
 {¶ 11} "A. He was behind me while I was sleeping. And I was facing that way.
 {¶ 12} "Q. Okay. And did C.M. say anything to you while he did this?
 {¶ 13} "A. No. I was asleep.
 {¶ 14} "Q. You were asleep? Well, were you awake when it happened?
 {¶ 15} "A. No.
 {¶ 16} "Q. Were you asleep before he came into the room?
 {¶ 17} "A. No. I was full — fully asleep.
 {¶ 18} "Q. You were falling asleep? Okay. But, when he came in and he put his penis in your butt, you were awake?
 {¶ 19} "A. No. Sleeping.
 {¶ 20} "Q. You were asleep? Okay. When you say you were asleep, do you mean you were just tired, or do you mean that you were completely asleep?
 {¶ 21} "A. Completely asleep.
 {¶ 22} "Q. You were completely asleep when he put his penis in your butt?
 {¶ 23} "A. Yeah.
 {¶ 24} "Q. Okay. Then how do you know that that's what he did?
 {¶ 25} "A. Because I told mom.
 {¶ 26} "Q. Because you told mom? Okay. So, is it the truth when you say that C.M. put his penis in your butt — or his privates, I'm sorry?
 {¶ 27} "A. Yeah.
 {¶ 28} "Q. It is the truth?
 {¶ 29} "A. Oh-huh.
 {¶ 30} "Q. Okay. Well, can you explain to the Judge why you would say you were asleep?
 {¶ 31} "A. Yeah.
 {¶ 32} "Q. How do you know you weren't dreaming?
 {¶ 33} "A. I was dreaming.
 {¶ 34} "Q. You were dreaming? Okay. So, when this happened, was it a dream, or did it really happen, T.L.? We need for you to tell us the truth.
 {¶ 35} "A. It really happened."
 {¶ 36} T.L. admitted on cross-examination that after C.M. was taken from his house he told his brother, Ryan, age six, that C.M. never did what he alleged and that he lied because he didn't want C.M. to live with him. T.L. testified he lied to his brother Ryan because "it did happen." (T. 28). T.L. also admitted he told his father that C.M. did the same thing to him the night before July 4th.
 {¶ 37} T.L.'s father testified that C.M. was in juvenile detention on July 4, 2005. (The docket and journal entries indicate C.M. was charged on June 23, 2005 and was in detention until July 20, 2005.)
 {¶ 38} He also placed a date on the alleged incident as June 22, 2005. T.L.'s father said he took T.L. that same day to the Dayton Children's Hospital when T.L. complained of great discomfort with his anus but the doctor could find no evidence that T.L. had been abused. (T. 37).
 {¶ 39} C.M. testified in his own defense and denied ever abusing his brother. He said he had no idea why his brother would say he sexually abused him. He said his brother had watched a pornographic movie his mother had borrowed from a friend. He admitted that when he was interviewed by the police detective, he did not make eye contact, but he said he didn't because he was trying to figure out why his brother would think up something like that because "I have never done anything to that kid." (T. 44).
 {¶ 40} At the conclusion of the adjudication hearing, the trial judge stated he believed T.L.'s testimony beyond a reasonable doubt and found C.M.'s testimony "not believable." (T. 46).
 {¶ 41} C.M. argues that the court's delinquency finding was against the manifest weight of the evidence because T.L.'s testimony was not credible. The credibility of witnesses and the weight to be given to their testimony is a matter for the trier of facts to resolve. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212. "Because the fact-finder, be it the jury or, as in this case, the trial judge, has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the fact-finder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the fact-finder, who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. An appellate court should not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 42} The term "manifest weight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2d 541. Weight is not a question of mathematics, but depends on its effect in inducing belief. Id. When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact-finder's resolution of the conflicting testimony. Id. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 43} A review of the entire trial reveals a lack of overall coherence in the alleged victim's testimony. Not only is this a case involving a child of tender years, age five, but there is a lack of substantial credible evidence. The child testified that I was "fully asleep" and "I was dreaming."
 {¶ 44} There is a complete lack of physical evidence and no expert testimony that the child exhibits behavior that is consistent with abuse. The fact finder's burden to assess the credibility of a young child is particularly important and arduous in sex abuse cases like this one, where the lack of physical evidence and eyewitness testimony necessitates a credibility contest.
 {¶ 45} Where the State's case is so heavily dependent on the credibility of a child victim, the record should minimally demonstrate the child is not only credible, but competent. Although not raised by counsel as an assigned error, the competency evaluation of this child is not recorded. Certainly, in a situation where a child asserts he was "dreaming" there should be a record that substantiates the child can distinguish between fantasy and reality. We do not have the benefit of a voir dire that demonstrates this five-year-old is capable of receiving just impressions of facts and relating them truthfully. We recognize that the judge apparently conducted a competency hearing in chambers and served as fact finder, but the record does not demonstrate this child can receive just impressions.
 {¶ 46} In fact, in early questioning, this child provided wrong answers to simple preliminary questions, misidentified the prosecutor and merely acknowledged the judge talked to him about truth vs. lies:
 {¶ 47} "Q. Do you remember me?
 {¶ 48} "A. Yeah.
 {¶ 49} "Q. We have talked before?
 {¶ 50} "A. Yeah.
 {¶ 51} "Q. Do you remember what my name is?
 {¶ 52} "A. Lori.
 {¶ 53} "Q. Is it Jennifer?
 {¶ 54} "A. Yes.
 {¶ 55} "Q. Who do you live with?
 {¶ 56} "A. Sarah and Ryan and Dad and Mom.
 {¶ 57} "Q. Okay and do you have any other brothers or sisters?
 {¶ 58} "A. No.
 {¶ 59} "Q. Do you have a brother named [C.M.]?
 {¶ 60} "A. Yeah.
 {¶ 61} "Q. Now did the Judge talk to you about the difference between the truth and a lie, right."
 {¶ 62} "A. Yeah."
 {¶ 63} This child's testimony is undercut by other material deficiencies as well. He told his older brother that he lied about the abuse because he didn't want C.M. to live with him. He acknowledged that he told his father that C.M. did the same thing to him the night before July 4th, a physical impossibility since C.M. was in juvenile detention on July 3. Standing alone, a "wrong" date may be insignificant particularly with a witness who is only five years old, but in this case, we cannot overlook other major flaws in the testimony.
 {¶ 64} As we noted in State v. Jones (1996),114 Ohio App.3d 306, "the manifest weight analysis departs from the sufficiency-of-the-evidence standard in two subtle but significant respects. State v. Hufnagle (Sept. 6, 1996), Montgomery App. No. 15563, unreported, 1996 WL 501470. First, a manifest-weight claim requires the court to consider not only the sufficiency of the evidence if believed, but also the believability of the evidence. Id. at 6. Thus, a verdict may be supported by sufficient evidence, yet be against the manifest weight of the evidence. Accordingly, we must look not only at the amount of evidence presented, but also at the evidence's capacity to persuade. Second, when conducting the manifest-weight analysis, we do not construe the evidence "in the light most favorable to the prosecution"; rather, "`[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed.'" Id. at 9, quoting State v. Martin (1983), 20 Ohio App.3d 172.
 {¶ 65} Sitting as a thirteenth juror, we reverse this adjudication of delinquency for rape as against the manifest weight of the evidence. The first assignment of error is sustained.
 {¶ 66} In his second assignment, C.M. argues that the State never provided any evidence of when the alleged delinquent act occurred. The complaint alleged that the delinquent act occurred between June 13, 2005, and June 22, 2005. While T.L. did not testify concerning the actual date of the sexual conduct, his father testified that he took T.L. to the hospital because he complained of discomfort in his anus on June 22, 2005. The trier of fact could reasonably infer the alleged assault took place shortly before that date.
 {¶ 67} The date of an offense is not an element of the offense. State v. Ahedo (1984), 14 Ohio App.3d 366. The date of the offense may be important to provide an adequate notice to the defendant for due process purposes. A defendant is not prejudiced by the failure of an indictment to specify the dates and times upon which the charged offenses allegedly occurred if such failure does not impose a material detriment to the preparation of a defense. State v. Barnecat (1988), 44 Ohio App.3d 149. The State presented evidence that the delinquent act occurred shortly before June 22, 2005. The appellant's second assignment is overruled.
 {¶ 68} The judgment of the trial court is reversed. Pursuant to App.R. 12(D), the case is remanded to the Juvenile Court for further proceedings.
Grady, P.J., concurs.