OPINION
{¶ 1} Juvenile Appellant A.E. appeals from his adjudication of delinquency for one count of rape and two counts of gross sexual imposition.
 {¶ 2} The State's evidence at trial established the following facts. Although A.E.'s father had legal custody of him, A.E. lived with his mother, Lisa Frye, in Dayton. The parties stipulated to A.E.'s age of fourteen. A.E.'s eleven-year-old half-sister, *Page 2 
M.E., and his twelve-year-old half-brother, B.E., were in the custody of their father before being removed from the home by Greene County Children's Services because the children often were unclean and unfed. Temporary custody of M.E. and B.E. was given to their paternal aunt, Lynette Robinson, in May, 2006. The children continued to visit with both of their parents.
 {¶ 3} Lisa picked M.E. and B.E. up on Friday, July 14, 2006, and brought them back to her Dayton apartment for the weekend. Also present were A.E., and Lisa's boyfriend, Mike. After Lisa and Mike went to bed for the night, the three children stayed up playing video games. B.E. and A.E. were at each end of the couch with M.E. in the middle. A.E. had a blanket on his lap. A.E. whispered something in M.E.'s ear that she could not understand, and then he took her hand and placed it on his penis, which she could see exposed under the blanket, and made her masturbate him.
 {¶ 4} Later that night the three children went to bed for the night. M.E. slept in her half-sister Michelle's bed in the dining room, because Michelle was visiting with her Aunt Tammy Rue. B.E. slept on the living room floor, while A.E. slept on the couch.
 {¶ 5} The next morning Lisa and Mike went to work and left A.E. in charge of his younger siblings. A.E. went into the dining room and jumped on M.E.'s bed, waking her up. A.E. said, "Have sex with me, or I'm not going to feed you." M.E. believed her brother's threat. She knew that she could not reach the kitchen cabinets without her brother's help, and she believed that A.E. would follow her and B.E. around the apartment to physically stop them from eating any food they might find. M.E. let A.E. remove her pants and have intercourse with her. The two were lying on their sides, with M.E.'s back to the wall; she could not see B.E. or anything else behind *Page 3 
A.E. However, B.E. had seen A.E. go into the dining room and followed him in time to see A.E. remove M.E.'s pants. B.E. then sat on the bed in which A.E. was raping their sister. Although he could not see body parts, he could see the back-and-forth movement of A.E.'s body.
 {¶ 6} After A.E. was finished, he and B.E. went into the living room to play a video game. There A.E. made B.E. masturbate him. B.E. complied because A.E. threatened to refuse him food. B.E. believed that A.E. would follow through on his threat because A.E. had threatened things before and followed through, like hitting B.E. And, like his sister, B.E. was very familiar with the discomfort of hunger.
 {¶ 7} Lisa returned from work at noon, and she left with the three children to pick up their older sister, Michelle. There the children played with Tammy's new puppies. On Sunday evening Lisa dropped B.E. and M.E. off at Lynnette's home. When Lynnette arrived home from work very late that night, her adult daughter promptly told her that M.E. needed to talk with her. Lynnette spoke with the children, and both disclosed the sexual abuse. Lynnette then sent the children to bed. The following morning Lynnette called Lisa and then went to the police.
 {¶ 8} Following an investigation, the State filed a complaint in Montgomery County alleging A.E. to be a delinquent child by reason of committing one count of rape and two counts of gross sexual imposition.
 {¶ 9} In his defense at trial, A.E. focused on the discrepancies between M.E. and B.E.'s testimony and their statements to police. He also called his sister Michelle and his Aunt Tammy to the stand, neither of whom knew M.E. or B.E. well, and both testified that they noticed nothing unusual in the behavior of any of the three children *Page 4 
during the course of the weekend. Det. Lewis testified on A.E.'s behalf that no evidence was discovered in the rape kit collected from M.E. two days after the rape. A.E. then argued that M.E. and B.E. had made up the allegations because they were jealous that he and Michelle got to live with their mother, while they did not.
 {¶ 10} The trial court found A.E. responsible for all three counts. Because A.E.'s father had legal custody, and he lived in Greene County, the case was certified to Greene County for disposition. Following the completion of a predisposition investigative report, the trial court imposed fines and court costs, which A.E. could work off through community service. The court also ordered A.E. to: have no contact with his siblings or any child under the age of twelve; not use pornography; participate in mental health assessment and sex offender treatment; submit a DNA sample; and be committed to the Department of Youth Services. However, the court suspended that commitment, instead ordering A.E. to be placed for treatment at the Miami Valley Rehabilitation Center to be followed by intensive community control. A.E. appeals.
 {¶ 11} A.E.'s Assignment of Error:
 {¶ 12} "THE VERDICT OF THE JURY WITH RESPECT TO COUNT SIX (sic) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 13} In his sole assignment of error, A.E. argues that the testimony against him was so conflicting and inconsistent, that it was simply unbelievable. Therefore, he concludes that his adjudications were against the manifest weight of the evidence. Because we do not agree that the trial court lost its way in finding the victims credible, A.E.'s arguments fail, and we will affirm the judgment of the trial court.
 {¶ 14} When reviewing a judgment under a manifest weight standard of review *Page 5 
"[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
 {¶ 15} The primary question of witness credibility lays with the finder of facts. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus. The factfinder may accept or reject all, part, or none of the testimony of each witness. State v.Antill (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548. "Because the trier of fact sees and hears the witnesses and is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." In re J.S., Montgomery App. No. 22063,2007-Ohio-4551, ¶ 50, quoting State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 16} The thrust of A.E.'s arguments is that his siblings' testimony was so rife with inconsistencies that it was unbelievable. "An appellate court should not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict." In reC.M., Montgomery App. No. 21363, 2006-Ohio-3741, ¶ 41. That is not the case here.
 {¶ 17} A.E. was adjudicated delinquent for rape, in violation of R.C. *Page 6 
§ 2907.02(A)(2), which states: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." M.E. described how A.E. woke her up and demanded that she have sex with him or she would not be allowed to eat. M.E. submitted because she believed his threat. M.E. knew that she could not reach food in the cabinets and that she was dependent upon A.E. for food that day. More importantly, in light of her recent history of often being forced to go without food, this threat was particularly imposing to M.E. She described how A.E. removed her pants and raped her while the two were lying on their sides with M.E.'s back to the wall. Additionally, unbeknownst to M.E., B.E. saw A.E. remove M.E.'s pants and the subsequent back and forth movement of A.E.'s body.
 {¶ 18} A.E. was also adjudicated delinquent by reason of committing gross sexual imposition, in violation of R.C. § 2905.(A)(4), which states: "No person shall have sexual contact with another, not the spouse of the offender * * * when [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person." Related to one count of gross sexual imposition, M.E. testified that A.E. pulled her hand under a blanket, placing it on his exposed penis, and then he made her masturbate him. B.E., who was sitting on the same couch, did not see exactly what was happening, but he did see M.E. under the blanket on A.E.'s lap. As for the other count, B.E. told the court how A.E. made B.E. masturbate him, threatening as he did with M.E., to refuse B.E. food. Again, with B.E.'s history of often going hungry, this threat was particularly effective.
 {¶ 19} It is true, however, that there were some inconsistencies between the *Page 7 
testimony of M.E. and B.E. and between their testimony and their earlier statements to investigators. Such discrepancies, while significant, are not automatic grounds for the loss of all credibility. In fact, it is quite common for such discrepancies to exist. See, e.g., In reJ.S., supra. Moreover, the discrepancies in this case were not as glaring as A.E. would have us believe.
 {¶ 20} For example, A.E. points out that B.E. testified that he was on the bed in which A.E. raped M.E., yet M.E. said that she did not see B.E. and believed that he was in another room. This argument ignores M.E.'s further explanation that she could not see beyond A.E., so she was not sure where B.E. was; she was only guessing that he was playing in the living room.
 {¶ 21} A.E. also insists that B.E. and M.E.'s claims that they submitted to the abuse so that A.E. would let them eat was not believable. While that might be the case under a different set of circumstances, we cannot ignore the significant impact of that particular threat in light of B.E. and M.E.'s very recent history of regularly being unfed and hungry in their father's home. Moreover, both victims explained that they expected to A.E. to follow through on that threat, even to the extent of following them around the apartment to physically stop them from trying to eat anything.
 {¶ 22} In one last example, A.E. claims that B.E. talked of oral sex between A.E. and M.E., while M.E. said that only her hand was placed on A.E.'s penis, and she denied oral sex. It must be remembered that M.E. did testify that her head was under the blanket. It would be understandable then that B.E. might interpret seeing movement while his sister's head was under the blanket as oral sex.
 {¶ 23} In this case, we do not believe that discrepancies such as these were *Page 8 
sufficient to make it patently apparent that the trier of facts lost its way in arriving at its verdict. Based on all of the testimony, there is no indication that the trial court clearly lost its way in adjudicating A.E. delinquent for rape and gross sexual imposition. A.E.'s sole assignment of error is overruled. Accordingly, the judgment of the trial court will be affirmed.
FAIN, J. and GRADY, J., concur.
Copies mailed to:
Stephanie R. Hayden
Jay A. Adams
 Hon. Robert W. Hutcheson *Page 1