[Cite as *State v. Deere*, 2025-Ohio-1275.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| Appellee | : | C.A. No. 2024-CA-15 |
| v. | : | Trial Court Case No. 2024 CR 035 |
| CHAD WESTLY DEERE | : | (Criminal Appeal from Common Pleas Court) |
| Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 11, 2025

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

SAMANTHA B. WHETHERHOLT, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Chad Westly Deere appeals from his conviction of felonious assault. He argues that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence; he also argues that the trial court erroneously concluded that he was not remorseful. For the following reasons, the judgment of the trial court will

be affirmed.

## Facts and Procedural History

{¶ 2} On March 11, 2024, Deere's wife was seriously injured at their home; the facts surrounding the incident are in dispute, but his wife, A.D., sought medical help the next day for serious head injuries as well as other injuries. Deere was indicted for felonious assault on April 1, 2024, and he was tried by a jury on May 28-29, 2024. He was found guilty and was sentenced to an indefinite term of four to six years in prison.

{¶ 3} Deere appeals, raising two assignments of error.

## Sufficiency and Weight of the Evidence

{¶ 4} In his first assignment of error, Deere contends that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. The evidence presented at trial was as follows:

{¶ 5} A.D., a registered nurse, testified that on March 11, 2024, when she finished working for the day, she and Deere went to the Fraternal Order of the Eagles in Urbana ("the Eagles") for a couple of drinks. According to A.D., she and Deere had not argued on the way home from the Eagles or upon arriving at home. After they returned home, A.D. prepared some food for the week, and while she waited for it to cool down, Deere came out of their bedroom and said something "really derogatory" about A.D.'s deceased mother. This resulted in a verbal altercation in which A.D. told Deere that she wasn't going to keep living the way they had been living. Deere then returned to the bedroom, and A.D. went into the pantry.

{¶ 6} According to A.D., Deere came back out of the bedroom a short time later

and pushed her several times. The first time she stumbled, but the second time she fell backward, hitting her head on the pantry door. As she lay on the floor, Deere stood over her or straddled her and punched her more times than she could count, "as if he was fighting his worst enemy"; he also "stomped" on her left abdomen. When he stopped, he looked at A.D. "with disgust and loathing" and went back to the bedroom. A.D. testified that she had tried to defend herself by kicking at Deere. She did not believe either of them had been intoxicated. A.D. acknowledged that her home had been cluttered and that there was a "tub or a tote" near the French doors at the rear of the kitchen on the date of the assault, but she said that the storage tub had not played a role in her fall.

{¶ 7} Initially, A.D. had trouble figuring out how to get herself off the floor. Once she did, she gathered some belongings and her work computer and went to her cousin's home. She testified that she was scared, and she told her cousin what had happened.

{¶ 8} Although A.D. had planned to work from her cousin's home the next day, she was unable to do so because of internet problems. As such, she returned home, where Deere was still asleep. A.D. went into her home office, locked the door, and worked all day, but she had a headache that progressively worsened and was more severe than any migraine she had ever experienced. A.D. felt pressure behind her eyes, and she knew there was "something real wrong," so she went to an emergency room in Urbana.

{¶ 9} At the emergency room, a CAT scan revealed a subdural hematoma; A.D. was transported to Miami Valley Hospital and admitted to the trauma unit for a brain bleed. A.D. was released after being monitored and administered medication, but she was readmitted the following week after another CAT scan revealed that the bleeding had

increased and surgical intervention was required. A.D. had multiple surgical procedures, was put on "life support" for two days, and was hospitalized for a total of 16 days. When she woke up, she was initially unable to speak. At trial, A.D. stated that she has two areas of permanent brain damage and memory problems, that her speech continued to be affected by saying wrong words, and that she had moderate to severe headaches daily.

{¶ 10} A.D. identified photos taken the day after the assault by Deputy Tim Morris at the emergency room; the photos showed abrasions and redness to the back of her head, redness and swelling on her left cheekbone and mouth, redness to an eye, bruising on the right side of her forehead, swelling on her left knee, and an abrasion on her ankle. A.D. stated that more bruising became apparent in the following days.

{¶ 11} A.D. did not initially identify her assailant at the emergency room out of concern for her family, especially her four children, but once the police were involved, she knew that she would have to tell the truth about what had happened.

{¶ 12} A.D. testified that she had been married to Deere for 24 years. She also testified that Deere was on disability as a result of a car accident in 2018, in which he sustained several fractures to his feet and injuries to his back. Prior to the accident, he had worked as a mechanic, but he had been unable to do so after the accident. A.D. stated that Deere's injuries occasionally affect his mobility and balance.

{¶ 13} The parties stipulated that A.D. had sustained a subdural hematoma which had carried a substantial risk of death and had required lifesaving surgery to treat and repair, and that she had been placed on life support. The parties also stipulated that she

suffered acute pain of such duration as to result in substantial suffering, and that the injuries she sustained constituted serious physical harm.

{¶ 14} Dr. Patrick Ray, an emergency room physician at Urbana Hospital, testified that he treated A.D. after the assault. He described her numerous symptoms and that she had reported being hit numerous times, falling into and hitting her head on a door, and being kicked while she was on the ground. A.D. was "alert and oriented" when Ray saw her, and she was "very specific" that she had been assaulted; the details she provided of her assault never changed.

{¶ 15} Kristin Blair, a registered nurse at the emergency room in Urbana, also treated A.D. after the assault. According to Blair, A.D. said that she had been assaulted but had not been willing, at that time, to identify who had assaulted her; A.D. had been "concerned about family relations." Blair testified that A.D. had recounted being punched in the face several times, hitting her head on a door, and being kicked.

{¶ 16} A.D.'s cousin testified that, when A.D. came to her home on the night of March 11, 2024, A.D. was very distraught, crying, and trembling. A.D. stated that her husband had assaulted her, she had fallen to the floor, and he had punched her in the head and stomped on her. According to the cousin, A.D. had left her home to get away from Deere and did not appear intoxicated or smell of alcohol.

{¶ 17} Deputy Tim Morris of the Champaign County Sheriff's Office testified that he was on road patrol on the evening of March 12, 2024, when he was dispatched to Mercy Memorial Hospital on the report of an assault. Morris observed that A.D. appeared to be in a lot of pain. She stated that she had been assaulted, pushed to the

ground, kicked, and punched and that she had hit her head on the pantry door at her residence. A.D. told Morris that she had had only two drinks at the Eagles before the assault, and that Deere had upset her with a comment about her mother. Morris photographed A.D.'s injuries, and the photos were admitted at trial. After speaking to A.D., Morris went to Deere's home to arrest him. At that time, Morris did not observe any injuries to Deere's hands, and Deere was wearing shoes. Morris testified that, when he responded to Deere's home, Deere was walking without difficulty, but Morris did not see Deere do anything strenuous.

{¶ 18} Deere testified that, as a result of a 2018 car accident, he experienced "a lot of head trauma," lacerations to his skull, a broken nose, and a broken eye socket. Deere testified that he also broke his right foot, which required five surgeries and "three different sets of hardware," and broke his neck, which required three back surgeries with "a pain stimulator installed" in his back. He stated that the injuries from the accident had affected his mobility, and he was unable to maintain his balance on his right foot; he also stated that, because of the reconstructive surgeries on that foot, he was unable to kick anything with that foot. According to Deere, if he were to bend down, he would be unable to maintain his balance. He testified that he had recently fallen in the shower and landed "back first against the toilet," and his gait had been affected by the fall. Deere identified photos of his right foot and said that it was "approximately two times bigger" than his left foot. Deere stated that kicking anything with his right foot would cause him "excruciating pain" and risk loosening the hardware in his foot or breaking a bone.

{¶ 19} Deere stated that he and A.D. went to the Eagles around 8:00 p.m. on

March 11 and stayed for an hour and a half. According to Deere, he had one drink, which was a "double," and A.D. had four vodka doubles in half an hour; he does "not drink hardly at all" because alcohol increases his pain. On the way home, A.D. became belligerent and irate and accusing Deere of not paying the bills. According to Deere, that's when he said A.D. was "acting like her mother," who changes character when she drinks. Deere thought A.D. was intoxicated by her glassy eyes and slurred speech. After his comment about her mother, A.D. became very upset and angry.

{¶ 20} Deere testified that, when they got home, Deere went to the garage for about an hour to allow A.D. to calm down. He then came into the house, went to the bedroom, took his medicine for sleep, and got into bed. According to Deere, A.D. came into the bedroom to continue her "verbal assault," calling him names and telling him she wished they had never married. He told A.D. he did not wish to argue and, when she left the room, he shut and locked the door, but A.D. "busted in the locked door" three times to continue "the verbal assault and mental assault" against him. The third time, Deere got out of bed and told A.D. he did not want to fight; she was walking backward when she tripped over a big tote by the back door and fell to the ground. Deere denied that he had pushed A.D. He acknowledged that there had already been some damage to the bedroom door and that it had not been difficult to push through it.

{¶ 21} Deere stated that the medicine he took for sleep made him very drowsy. He also stated that their home was very cluttered, and there were several canned goods on the floor in the pantry that prevented the pantry door from being closed. He stated that the tote A.D. tripped on was large, with a lid, and there were things on top of it.

Deere was surprised when A.D. fell, and he denied hitting her or kicking her. According to Deere, he approached A.D. to help her up, and she began to kick at him from the ground in an erratic manner. Deere immediately returned to bed, and A.D. "got right up" and continued ranting and raving "hysterically." Deere believed she was still intoxicated, and he did not observe any injury to her head or impairment to her mobility.

{¶ 22} Deere stated that A.D. had told him to leave the residence, but his sleeping medicine had already taken effect, and he just wanted to be left alone. Deere did not remember A.D. retrieving her belongings or leaving the home. When A.D. returned home in the morning, she went straight to her office and shut the door, and she and Deere did not speak at all during the day. Around 5:30 p.m., Deere noticed that A.D.'s car was gone, but he stated that she typically runs errands after work. Deere learned that A.D. was at the hospital with a head injury around 11:15 p.m. when he received a call from his son. A.D. did not answer Deere's subsequent phone call, and then law enforcement arrived at his home "with guns drawn."

{¶ 23} Deere stated that his marriage had been "going downhill" for some time, with A.D. nagging and picking at him more and more. Upon learning of A.D.'s injury, Deere was worried about her. He stated that the injuries to A.D.'s face, as depicted in photos at trial, probably happened when she was on the floor kicking him. Deere stated that A.D. had lied about the events of the evening to get him "out of the picture," and he thought that she had been in a relationship with another man for some time. He testified that, in his opinion, A.D. had not called the police because her version of events was untrue and, as a registered nurse, she could lose her job if she admitted to being drunk

or verbally, mentally, or physically abusive.

**{¶ 24}** Deere acknowledged that he and A.D. had gotten into an argument at the Eagles in January 2024, as a result of which he had gotten out of their car and walked ten miles to their residence. After this incident, he posted on Facebook that he had walked ten miles home on his bad foot. He claimed that A.D. had left him alone out there without a phone or jacket and had driven herself home while intoxicated.

**{¶ 25}** David Sutch, Deere's stepfather, testified that Deere's life had drastically changed as a result of the car accident, and he is disabled. Sutch also stated that Deere's marriage had been going downhill for about two years.

**{¶ 26}** Deere argues that the jury's finding that he had committed felonious assault was supported by insufficient evidence and was against the manifest weight of the evidence. Although Deere acknowledges that A.D. testified that he had pushed her down, punched her, and kicked her, he argues that there was insufficient evidence that he had knowingly caused her injury and that the weight of the evidence did not support such a finding. He asserts that A.D. was intoxicated and tripped over a storage bin; he also points to Dep. Morris's testimony that he did not observe any injuries or marks on Deere's hands when he was arrested. He further contends that his own physical limitations from the car accident made it impossible for him to have inflicted A.D.'s injuries in the manner she alleged. The State responds that the jury did not lose its way in believing the version of events established by the State's evidence rather than Deere's self-serving testimony.

**{¶ 27}** "An appellate court's function when reviewing the sufficiency of the

evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 28} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 29} It is well-settled that the primary question of witness credibility rests with the finder of facts. *In re A.E.*, 2008-Ohio-1864, ¶ 15 (2d Dist.), citing *State v. DeHass*, 2008-Ohio-1864, paragraph one of the syllabus. "The factfinder may accept or reject all, part, or none of the testimony of each witness." *Id.*, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). " 'Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular

witnesses," we must afford substantial deference to its determinations of credibility.' " *Id.*, quoting *In re J.S.*, 2007-Ohio-4551, ¶ 50 (2d Dist.), quoting *State v. Lawson*, 1997 WL 476684 (2d Dist. Aug. 22, 1997). An appellate court should not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *In re C.M.*, 2006-Ohio-3741, ¶ 41 (2d Dist.).

{¶ 30} R.C. 2903.11(A)(1) defines felonious assault and states that no person shall knowingly cause serious physical harm to another.

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

R.C. 2901.22(B).

{¶ 31} Having reviewed the entire record, we conclude that Deere's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence. The jury clearly credited the State's witnesses' testimony over that of Deere and his stepfather, and we defer to the jury's assessment of credibility. The jury reasonably credited A.D.'s testimony that Deere knowingly pushed her twice, causing her to fall into

the door, and then punched and stomped on her. Although Deere presented an alternate versions of events, the jury was not required to believe it.

{¶ 32} A.D. had consistently repeated her version of events. She told her cousin that Deere had assaulted and pushed her when she arrived at the cousin's home on the night of the assault to get away from Deere. A.D. told Dr. Ray in the emergency room that she had hit her head on a door; Ray stated that A.D.'s version of events never changed. A.D. had also related the same sequence of events to Nurse Blair and Dep. Morris.

{¶ 33} Deere suggested in his testimony that A.D. had lied about the events resulting in her injuries in order to get him "out of the picture," but the jury could have reasonably concluded that such a motivation was belied by the fact that A.D. did not immediately contact law enforcement and was initially reluctant to identify her assailant. Further, the jury could also have reasonably concluded that Deere's acknowledgment of a ten-mile walk home a few months before this incident cast doubt upon his testimony regarding his lack of mobility and balance dating back to the 2018 accident, as did Morris's testimony that Deere walked without impediment. The parties stipulated that A.D. had suffered serious physical harm. For these reasons, Deere's conviction was supported by sufficient evidence and was not against the manifest weight of the evidence.

{¶ 34} Deere's first assignment of error is overruled.

## Sentence

{¶ 35} Deere's second assignment of error argues that his sentence was contrary to law "because the trial court inappropriately construed his statements that he was

innocent as a lack of remorse."  Deere points to the following statement by the court at sentencing: "Defendant disputes the factual culpability for the offense.  Therefore, the Court cannot find that Defendant demonstrates genuine remorse."  The State responds that Deere's sentence is not contrary to law, and that this Court's review is limited.  The State also notes that Deere did not object to the court's conclusion that he lacked remorse.

**{¶ 36}** "The trial court has full discretion to levy any sentence within the authorized statutory range, and it is not required to make any findings or articulate its reasons for imposing a maximum or more than minimum sentence."  *State v. Goss*, 2024-Ohio-2648, ¶ 8 (2d Dist.), citing *State v. Jones*, 2021-Ohio-325, ¶ 85 (2d Dist.)  When reviewing felony sentences, a court of appeals must apply the standard of review set forth in R.C. 2953.08(G).  *State v. Williams*, 2022-Ohio-2897, ¶ 18 (2d Dist.), citing *State v. Farra*, 2022-Ohio-1421, ¶ 73 (2d Dist.).  Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law."  *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

**{¶ 37}** An appellate court may not independently "weigh the evidence in the record and substitute its judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12."  *State v. Jones*, 2020-Ohio-6729, ¶ 42.  "The inquiry is simply whether the sentence is contrary to law."  *State v. Bartley,* 2023-Ohio-2325, ¶ 9 (2d Dist.).  "A sentence is contrary to law when it falls outside the

statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12." *Id.*, citing *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.).

{¶ 38} At sentencing, Deere stated that he would like to apologize to A.D. for his actions and "all the hurt and pain." The court asked what, specifically, he wanted to apologize for; Deere responded that A.D. had ended up on the floor because she fell over a tote, they had not had any physical contact with each other, "it was freak accident," and it could have been avoided if only he had left their home after they arrived there. The court stated, "I don't know that this Court, with the jury's finding, can take the position that, well, all you did was that you participated in an argument that you shouldn't have participated in."

{¶ 39} The court indicated that it had thoroughly considered R.C. 2929.11 and 2929.12, as it was required to do; we will not second-guess whether it imposed the sentence that best demonstrates compliance with R.C. 2929.11 and 2929.12. R.C. 2929.12(D)(5) required the court to consider whether Deere had shown genuine remorse for the offense in determining the likelihood of recidivism. Based on Deere's statements, the court reasonably questioned whether he accepted responsibility for the offense. The jury found that the State's evidence was more credible and, if that evidence were believed, Deere's statement deflected responsibility for and minimized his role in the event. This was not a case where a defendant waived allocution and the court then improperly considered the defendant's silence to infer a lack of remorse; *See State v. Brunson*, 2022-Ohio-4299, ¶ 83 ("[W]hen a defendant has maintained his or her innocence by pleading not guilty and has taken the case to trial, the trial court errs when it considers the

defendant's silence to be a demonstration of that defendant's lack of remorse for purposes of sentencing under R.C. 2929.12(D)(5))."

{¶ 40} R.C. 2929.13(D)(1) creates a presumption that a prison term is necessary to comply with the purposes and principles of sentencing for a first- or second-degree felony. Deere's sentence was within the statutory range for a felony of the second degree and was not contrary to law. R.C. 2929.14(A)(2)(a). The trial court did not err in weighing the sentencing factors as it did. Deere's second assignment of error is overruled.

{¶ 41} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .


TUCKER, J. and LEWIS, J., concur.