[Cite as *State v. Ferguson*, 2011-Ohio-6801.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK   COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case No. 2010-CA-1 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 08-CR-830 |
| v. | : | |
| | : | |
| VONDA L. FERGUSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 30th day of December, 2011.

. . . . . . . . . . .

DAVID W. PHILLIPS, Atty. Reg. #0019966, 221 West Fifth Street, Suite 333, Marysville, Ohio 43040
        Attorney for Plaintiff-Appellee

STEPHEN D. MARLOWE, Atty. Reg. #0072100, 8 South Third Street, Tipp City, Ohio 45371
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, J.

{¶ 1}   Vonda Ferguson appeals from her conviction and sentence for 32 crimes against five of her children.

{¶ 2}   Ferguson and her husband, James, adopted six children: Sherita (when she was

6 years old), Joseph (when he was 4 years old), Jermaine (as an infant), Valnita (as an infant), Julius (as an infant), and Vivian (as an infant). The family lived in Clark County from 2000 until 2004, when they moved to Union County. In November 2004, Ferguson left a voicemail message for one of the children's therapists, canceling an appointment. After she left the message, Ferguson can be heard threatening Jermaine: "'You better get those knives out of the sink before I stab you in the F'ing yellow chest.'" (Tr. 1628).[1] (Ferguson apparently thought that she had hung up the phone.) When the therapist listened to the message and heard the threat, she immediately called the police. An investigation ensued, and the children were removed from the Ferguson home. The state sought and, in 2005, the Fergusons relinquished permanent custody of the children.

{¶ 3}  Ferguson was charged with committing 32 crimes against all of the children except Vivian–abuse, torture or cruel abuse, permitting abuse, excessive physical discipline, repeated administration of unwarranted discipline, felonious assault, and rape.[2] All five children testified at trial, as well as the physician experts and the psychological experts who had evaluated the children. In November 2009, a jury found Ferguson guilty on all charges.[3] The trial court sentenced her to a total of 65 years in prison. Ferguson timely appealed.

---

[1]The voicemail message was played for the jury, but a transcript of it is not in the record. Quoted is Jermaine's testimony.

[2]Ferguson was not alleged to have abused Vivian. James was indicted on 20 counts of endangering children, 5 counts of permitting child abuse, and 5 counts of felonious assault. (Clark County Case No. 07CR1011.) The case was tried to a jury in April 2008, and the jury found James guilty of all but three counts. He was sentenced to 65 years in prison. We affirmed his conviction in *State v. Ferguson*, Clark App. No. 08CA0050, 2011-Ohio-4285.

[3]5 counts of abusing a child, R.C. 2919.22(B)(1); 5 counts of torturing or cruelly abusing a child, R.C. 2919.22(B)(2); 5 counts of permitting child abuse, R.C. 2903.15(A); 5 counts of excessive physical discipline of a child, R.C. 2919.22(B)(3); 5 counts of repeatedly administering unwarranted discipline, R.C. 2919.22(B)(4); 5 counts of felonious assault (serious physical harm), R.C. 2903.11(A)(1); and 2 counts of rape (force or threat of force), R.C. 2907.02(A)(2).

**{¶ 4}** She now assigns four errors to the trial court. Ferguson alleges that the trial court erred by allowing an expert witness to testify as to the veracity of Sherita's statements. Ferguson also alleges that the trial court erred by allowing the state to purposefully discriminate against an otherwise qualified and unbiased prospective juror based on her race. Ferguson further alleges that her convictions are against the manifest weight of the evidence. She lastly alleges that the trial court erred by limiting her cross examination of Valnita. There is no merit to any of these allegations, so we affirm.

## I

**{¶ 5}** The children's testimony of the abuse they suffered was very similar and was corroborated by the testimony of two physician experts.

### A. Joseph's testimony

**{¶ 6}** Joseph was 17 years old when he testified. He told the jury that he was beaten with a "white Honda belt," an extension cord, and a duct-taped stick. Often, said Joseph, James beat him at Ferguson's direction and while she watched. Joseph testified that sometimes Ferguson would beat him herself. He said that she would also beat him with an orange bat. The beatings, said Joseph, often drew blood that would soak through his underwear. Joseph told the jury that Ferguson also hit his fingernails and toenails with the head of a hammer and hit him with the hammer's claw, once chipping a front tooth. He further testified that Ferguson used a clothes iron to burn him. If he soiled himself, said Joseph, Ferguson made him wear his soiled underwear on his head and eat his own feces. She withheld food from him, sometimes for one or two days at a time. Ferguson stuck a plunger handle down his throat. Joseph also said that Ferguson had twice shoved the plunger handle

into his rectum. James, Joseph testified, would hold him upside down over a banister in their home, and once stabbed him with a pen in his ribs, leaving a scar. Joseph described scars on his left arm where he said Ferguson stabbed him with a steak knife and burned him with an iron. During his testimony, Joseph stepped down from the stand and removed his shirt to show the jury some of the scars on his upper body. Joseph further told the jury that Ferguson and James duct-taped him to a chair. Jermanine, Julius, and Valnita testified that they saw Joseph duct-taped to his bed.

{¶ 7}   Joseph said that he often tried to run away but the police would always bring him back, where he would get beaten more. Ferguson and James threatened to kill Joseph if he told anyone about the abuse. Still, Joseph tried to tell police what was happening, but, said Joseph, they never believed him.

**B. Julius's testimony**

{¶ 8}   Julius was 15 at the time of trial. He too testified that a "white Honda belt" and duct-taped stick were used to beat him until he bled. Julius told the jury that he saw his sibling beaten and bleeding too. He said that the beatings were a daily occurrence. Julius testified that Ferguson sometimes withheld food from him. And she also made him wear his soiled underwear on his head.

{¶ 9}   Julius told the jury that Ferguson once broke his leg when she pulled him off his bunk bed and his foot caught in the railing. At the hospital, said Julius, he lied to the doctor about how the leg broke because he knew he would be in trouble if he told the truth.

{¶ 10} Julius admitted that, when the investigation began, he did not tell investigators the truth about what was happening because he was afraid of going back and being punished

more severely. It was not until he was pretty sure that he was not going back that he opened up about his experiences.

## C. Valnita's testimony

{¶ 11} Valnita was 14 when she testified. She, too, told the jury about daily beatings with a duct-taped stick and a "white Honda belt." She further testified that all of the children, except the baby Vivian, were beaten bloody with the belt. Valnita said that Ferguson struck her fingers with a hammer, breaking one of them. Valnita testified that Ferguson also burned her with a curling iron. She said that, if she wet her bed, Ferguson put her in a hot-water bath, which burned her, leaving scars. Valnita too said that, if anyone soiled his underwear, the child would have to wear the underwear on his or her face. And she too was hung over the banister. Ferguson sometimes also denied Valnita food. Valnita told the jury that once Ferguson used the duct-taped stick to jab her thigh repeatedly, leaving a mark.

## D. Sherita's testimony

{¶ 12} Sherita was 19 years old when she testified at the trial. Sherita testified that she too was beaten with James's white leather belt. Like Joseph, Sherita described being beaten with an orange bat. She was also beaten with a duct-taped stick. Sherita described one time when she was stripped naked, duct taped to the coffee table, and beaten with the bat, stick, and belt. Sherita told the jury that Ferguson would also hit her fingernails and toenails with a hammer until the nails were bloody and eventually fell off. Ferguson also burned her with a clothes iron and a curling iron. She said that James hung her, too, over the banister. Sherita testified that she had to steal food because Ferguson did not always feed her. Like she did to Valnita, Ferguson made Sherita sit in a tub of hot water, which left marks on her legs. And

when Sherita would not stay in, Ferguson had James hold her head underwater.

{¶ 13} Sherita described to the jury how sore her throat was after Ferguson stuck a plunger handle down it, like Ferguson did to Joseph. Sherita further testified that, like she did to Joseph, Ferguson shoved the plunger handle into her rectum. Sherita also said that Ferguson forced her to eat feces from Vivian's dirty diaper.

### E. Jermaine's testimony

{¶ 14} Jermaine was 19 when he testified. Like all the others, Jermaine told the jury that he was beaten daily with the "Honda belt" or a duct-taped stick, often until he bled. Jermaine recounted that, while James beat them with the belt, Ferguson "would laugh and mock us, our screams and stuff, like we were in pain." (Tr. 1646). Jermaine described one incident in which Ferguson stabbed him with the jagged end of the duct-taped stick, leaving a scar. He testified that Ferguson hit his, and others', toes with a hammer. He told the jury that, although he was able to fend for himself, Ferguson sometimes denied Sherita and Joseph food.

{¶ 15} Jermaine admitted that, at first, he, like Julius, lied about what was going on in their home. He admitted making up stories about his scars. Jermaine admitted that everything he told an investigator during one interview was a lie. He explained that he was not sure what was happening and he wanted to stay on his parents' good side in case he went back. Only after Ferguson and James relinquished their parental rights, when he knew there was no chance of going back, did he feel comfortable opening up about the abuse.

### F. Experts' testimony

{¶ 16} Joseph, Valnita, and Jermaine were examined by Dr. Mary Sollinger Applegate, qualified as an expert in pediatrics, and by Dr. Philip Scribano, also qualified as an

expert in pediatrics, as well as in child-abuse pediatrics. Dr. Scribano also examined Julius. The examinations revealed scarring on each of the children's thighs, backs, and buttocks that was consistent with physical abuse.

{¶ 17} On Joseph, on his left arm, Dr. Scribano found a 1-inch scar, consistent with Joseph's explanation to the doctor that Fergson stabbed him there, and a burn mark, consistent with Joseph's explanation that Ferguson burned him with a clothes iron. Dr. Scribano also found other burn marks on Joseph. He further found a scar on Joseph's forehead that was consistent with Joseph's explanation that Ferguson hit him with a hammer's claw. Dr. Scribano found what he described as a "flap-like laceration scar"[4] on Joseph's chest, which Joseph told the doctor came from being whipped with a belt. Dr. Scribano told the jury that the scar and Joseph's explanation were consistent.

{¶ 18} In his examination of Julius, Dr. Scribano found only one noteworthy item. He found that Julius had a fairly significant leg-length discrepancy. Dr. Scribano said that such a discrepancy does not commonly result from a broken leg. The doctor believed that the discrepancy was likely the result of inadequate follow-up care. Scribano also found that Julius had a moderate amount of eczema on his arms, legs, and chest.

{¶ 19} On Valnita, Dr. Scribano noted burn marks, which Valnita told him were caused by Ferguson. He also found multiple scars on her left thigh, which she said were from being whipped with a belt. Scribano testified that her explanation was consistent with the marks. Dr. Applegate found burn scars on Valnita's arm and dark marks on her thighs. Applegate also found 20 or so spots of varying size on her back, from her shoulders down to

---

[4] According to one expert, a "laceration" is a "[f]ancy name for a cut." (Tr. 993).

her buttocks. Dr. Applegate told the jury that her "conclusion [from the spots] was that she [Valnita] was the victim of child abuse." (Tr. 1020). Based on her entire examination of Valnita, Applegate concluded "that Valnita suffered repeated episodes of physical abuse." (Tr. 1035-1036).

{¶ 20} Dr. Scribano and Dr. Applegate also found various burn and laceration scars on Jermaine. Of note was a long laceration scar on his chest–10 centimeters long, based on a picture that Dr. Applegate took of it with a ruler alongside. Applegate testified that she further found 10-12 circular, raised lesions on Jermaine's buttocks. Dr. Applegate told the jury that, based on her examination, she concluded "that Jermaine had suffered from physical abuse." (Tr. 1011).

{¶ 21} Dr. Scribano said that, based on his examination of all four children, he made, what he described as, a twofold diagnosis: "One is just a description of the findings, there were multiple scars, burn scars, and laceration scars; and the scars were consistent with and indicative with physical abuse. And that's the second diagnosis." (Tr. 1293).

{¶ 22} All of the abused children, except Sherita, were psychologically evaluated by Dr. Jolie Brahms, a clinical and forensic psychologist, who was qualified as an expert in both fields. Dr. Brahms testified that "[t]here was no Jermaine." (Tr. 1728). Brahms continued, "He was just repeating almost as if you were in the military and you were repeating what you were told by your superiors. There's that–that sense of him." (Tr. 1728). Julius, said Brahms, had a long history of depression and suicidal ideation, which persisted. Brahms testified that Julius told him that he (Julius) thought often about killing himself. Concerning Valnita, Dr. Brahms said that she needed to be placed in "[a]n environment in which she could develop age

appropriate behaviors and have age appropriate experiences that would enhance her self-esteem." (Tr. 1735). Finally, Dr. Brahms found that Joseph was perhaps the most psychologically damaged. Just as there was no Jermaine, Brahms said that "there was no Joseph." (Tr. 1708). Brahms described her impression of Joseph this way: "There was a robotic child, a shell of a child who spoke in hush tones, who was obedient, passive, fearful." (Tr. 1708-1709).

{¶ 23} Susanne Mitchell, a therapist and clinical counselor, who was qualified as an expert in that area, testified about Sherita. Mitchell saw Sherita for roughly two-and-a-half years, from 2002 until 2004. Mitchell testified that Sherita told her about the abuse, including many of the incidents that the children themselves testified about. Mitchell told the jury that after she assessed Sherita in 2002 she diagnosed her with reactive attachment disorder, attention deficient hyperactivity disorder (ADHD), posttraumatic stress disorder, and depressive disorder. Mitchell said that Sherita always told her that no one believed her claims of abuse.

{¶ 24} The defense presented several witnesses, including two psychologists who evaluated Sherita in 2000 and 2001. The defense presented no testimony that rebutted the state's experts' psychological or physical evaluations of the children or the conclusions that the experts drew from their evaluations.

## II.

{¶ 25} In the first assignment of error, Ferguson alleges that the trial court erred by allowing Susanne Mitchell to testify as to the veracity of Sherita's statements. The Supreme Court of Ohio prohibited this kind of testimony in *State v. Boston* (1989), 46 Ohio St.3d 108,

which held that "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." Id. at 129. We have held that an expert witness may not give an opinion as to the truth of a non-child victim's accusations. *State v. Miller* (Jan. 26, 2001), Montgomery App. No. 18102, citing *Boston* and *State v. Stowers* (1998), 81 Ohio St.3d 260. Whether or not Mitchell's testimony was improper, the trial court did not allow it, striking it from the record and giving the jury a curative instruction.

{¶ 26} After Mitchell testified that she saw Sherita for roughly two-and-a-half years, the prosecutor asked this (rather awkwardly worded) question:

{¶ 27} "Q. During that time frame, how would you perceive Sherita's presenting to you regarding these matters?

{¶ 28} "[DEFENSE COUNSEL]: I object, Judge.

{¶ 29} "THE COURT: Overruled.

{¶ 30} "THE WITNESS: Sherita remained entirely consistent in her claims about being abused by the Fergusons. She never waivered [sic] on it. In fact, the incidents and the things that she mentioned never changed. She also never changed in her concern and her worries about her brother Joseph and the other children in the home. I think she was more focused on Joseph because he was her biological brother and because she felt that he was probably more of a target than the other children. Sherita was never–she was entirely consistent.

{¶ 31} "BY [THE PROSECUTOR]:

{¶ 32} "Q. During that two and a half-year period, were there some times when she had issues because she just wanted to be believed?

**{¶ 33}** "A. *Sherita always stated she wasn't believed; and when I let her know that I believed her–*

**{¶ 34}** "[DEFENSE COUNSEL]: I object, Judge.

**{¶ 35}** "THE COURT: Okay, ladies and gentlemen, witness cannot comment on the veracity of another person that testified in this case. So I'm gonna ask this witness–you told her that. Why did you tell her that? Was there a purpose in your treatment for you telling her that?

**{¶ 36}** "THE WITNESS: (Nods head.) Yes.

**{¶ 37}** "THE COURT: Well, approach the bench, please." (Emphasis added.) (Tr. 2630-2631).

**{¶ 38}** While the trial court thought that Mitchell's testimony was an improper opinion concerning Sherita's veracity, we are not so sure. Mitchell was relating what she told Sherita; Mitchell was not giving her opinion on anything.[5] But we need not–and do not–decide this issue because the trial court struck the testimony from the record.

**{¶ 39}** At the (mostly untranscribed) sidebar conference that followed the objection, defense counsel moved for a mistrial. The next day, after hearing oral arguments, the trial court overruled the motion. The trial resumed with Mitchell's cross examination. But before defense counsel began, the court said:

---

[5]See the court's response to defense counsel's challenge to its finding that Mitchell's answer was unresponsive. The court pointed out that "[t]he question was never asked [of] the social worker if, in fact, the social worker believed her, only whether or not [there] were issues of believability." (Tr. 2655). "When she went on to say that she believed her," the court continued, "that was not responsive to the question." Id.

{¶ 40} "Before we continue with the testimony, I'm going to instruct the jury that it is the function of the jury to determine the credibility and truth and veracity of the witnesses, including any alleged victim.

{¶ 41} "The Prosecutor's last question to Miss Mitchell and her response is being stricken, and you are instructed that you cannot consider it for any purpose." (Tr. 2677-2678).

{¶ 42} Ferguson suffered no prejudice from the (what we are assuming to be) improper testimony. "Curative instructions have been recognized as an effective means of remedying errors or irregularities which occur during trial." *Shesler v. Consol. Rail Corp.*, 151 Ohio App.3d 462, 2003-Ohio-320, at ¶151, citing *State v. Zuern* (1987), 32 Ohio St.3d 56. "A trial jury is presumed to follow the instructions given to it by the judge." *State v. Henderson* (1988), 39 Ohio St.3d 24, 33, citing *Parker v. Randolph* (1979), 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713. Here the trial court gave a curative instruction. Since no evidence suggests otherwise, we presume that the jury followed the instruction.

{¶ 43} Other courts have concluded likewise in similar situations. In *Shesler v. Consol. Rail Corp.*, 151 Ohio App.3d 462, 2003-Ohio-320, the record showed that the trial court instructed the jury to ignore certain testimony. The appellate court said that nothing in the record suggested that the jury disregarded the instruction. Consequently the court presumed that the jury properly disregarded the testimony and concluded that any error "was remedied by the curative instruction provided by the lower court." And in *State v. Herring*, 94 Ohio St.3d 246, 2002-Ohio-796, the defense moved for a mistrial, arguing that a witness's in-court identification of the defendant was improper. The trial court denied the motion, and before the next witness was called, the court instructed the jury to disregard the identification

portion of the witness's testimony. On appeal, the defendant contended that no instruction could cure the prejudice of the witness's identification. The Ohio Supreme Court rejected this contention, saying that "jurors are generally presumed to follow the trial court's instructions, including instructions to disregard testimony." Id. at 254.

{¶ 44} The first assignment of error is overruled.

### III.

{¶ 45} In the second assignment of error, Ferguson alleges that the trial court erred by allowing the state to exclude an otherwise qualified and unbiased prospective juror because she is African American. It is unconstitutional for the state to exercise a peremptory challenge in a way that purposefully discriminates by excluding a member of a minority group from service on a jury. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 581, citing *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. We conclude that the trial court did not err when it found that the state did not purposefully discriminate.

{¶ 46} "[T]he trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal." *Hernandez v. New York* (1991), 500 U.S. 352, 364, 111 S.Ct. 1859, 114 L.Ed.2d 395; see *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶109 ("The facts support the trial court's decision."); *State v. White*, 85 Ohio St.3d 433, 437, 1999-Ohio-281 ("The facts in this case support the state's explanation."). "The conclusion of the trial court that the state did not possess discriminatory intent in the exercise of its peremptory challenges will not be reversed on appeal absent a determination that it was clearly erroneous." *Hernandez*, 63 Ohio St.3d, at 583, citing *Hernandez*. "The trial court's finding is entitled to deference, since it turns largely 'on

evaluation of credibility.'" *White*, at 437, quoting *Batson*, at 98 n.21.

{¶ 47} "A court adjudicates a *Batson* claim in three steps. In step one, the opponent of the peremptory challenge at issue must make a prima facie case that the proponent was engaging in racial discrimination. In step two, the proponent must come forward with a race-neutral explanation for the strike. In step three, the trial court must decide, on the basis of all the circumstances, whether the opponent has proved racial discrimination." *State v. Murphy* (2001), 91 Ohio St.3d 516, 528, citing *Purkett v. Elem* (1995), 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834, and *White*, at 436. If the state voluntarily explains why it challenged the prospective juror, the analysis may begin with the second step. *Murphy*, at 528. See *Hernandez*, 500 U.S., at 359; *Hernandez*, 63 Ohio St.3d, at 583. Once the state proceeds to explain its actions and the trial court addresses the ultimate question of discrimination, the first step issue of whether prima facie discrimination was established is moot. *White*, *supra*.

{¶ 48} In step two, "'[t]he prosecutor * * * must articulate a neutral explanation related to the particular case to be tried.'" *Hernandez*, 63 Ohio St.3d, at 582, quoting *Hernandez*. "'[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause.'" Id., quoting *Hernandez*. Here, the prosecutor used a peremptory challenge to excuse prospective juror number four, an African-American woman. Defense counsel asked for a *Batson* explanation. Without requiring defense counsel to establish a prima-facie case of discrimination, the prosecutor immediately explained the challenge:

{¶ 49} "During her initial voir dire, she indicated that she had read the news reports and felt that they were incredible and difficult to believe. When asked then later on if she had an opinion about it, well then she said, 'I honestly don't have an opinion about it.' And

emphasis on honestly which led me to believe she did have an opinion on it. And just observing her with voir dire with defense counsel that–I had some notes here that I can't read; but primarily, Your Honor, because of her response during her initial voir dire." (Tr. 755). The judge accepted this explanation: "That would satisfy the explanation–that would be a satisfactory explanation. She will be excused." (Tr. 755).

{¶ 50} The trial court's determination that the prosecutor did not purposefully discriminate is not clearly erroneous. The prosecutor's explanation for the challenge is race-neutral and related to this particular case. While the explanation justifying the prosecutor's challenge would not support a challenge for cause, the explanation did not have to. *Batson*, 476 U.S. at 97. Further, we note that an African-American did sit unchallenged on the final jury.[6] The Ohio Supreme Court has said that "[t]he presence of one or more black persons on a jury certainly does not preclude a finding of discrimination, but 'the fact may be taken into account * * * as one that suggests that the government did not seek to rid the jury of persons [of a particular] race.'" *State v. White*, 85 Ohio St.3d 433, 438, 1999-Ohio-281, quoting *U.S. v. Young-Bey* (C.A.8, 1990), 893 F.2d 178, 180.

{¶ 51} Ferguson asserts that the prosecutor questioned African-American prospective jurors about their answers on a juror questionnaire more forcefully than white prospective jurors who answered the questionnaire similarly. It is true that "[a] facially neutral reason for a strike may indicate discrimination, if the state uses it only to eliminate jurors of a particular cognizable group." *Murphy*, at 529, citing *Coulter v. Gilmore* (C.A.7, 1998), 155 F.3d 912,

---

[6]It is immaterial that he was excused part way through the trial for health reasons.

921. But we do not agree that the intensity of the prosecutor's questioning correlated with race. See id. (rejecting as unpersuasive the defendant's argument that, if the prosecutor's stated concern was sincere, he would also have struck a prospective white juror).

{¶ 52} The second assignment of error is overruled.

## IV.

{¶ 53} In the third assignment of error, Ferguson argues that her convictions are against the manifest weight of the evidence. We disagree. Before a reviewing court may reverse based on the weight of the evidence, the state must have presented legally sufficient evidence to support conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 388, 1997-Ohio-52, quoting *Tibbs v. Florida* (1982), 457 U.S. 31, 42-43, 102 S.Ct. 2211, 72 L.Ed.2d 652. Given that the evidence is adequate, the question in a weight-of-the-evidence review "concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) Id. at 387. The focus therefore is on the conflicting evidence. See id. ("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."), quoting *Tibbs*, at 42. Based on the entire record, a reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id., quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Because "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence

weighs heavily against the conviction," id., quoting *Martin*, at 175, reviewing courts are reluctant to reverse based on the weight of the evidence.

{¶ 54} Ferguson contends that the children's testimony should be accorded little, if any, weight because, she says, their testimony conflicts in places with that of the experts and because some of it is not corroborated by physical evidence.

**A. Credibility of the victims**

{¶ 55} Ferguson contends that the children's claims of physical abuse should not be believed because, she asserts, their description of one or two of their scars conflicts with the experts' descriptions. We disagree

{¶ 56} "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill* (1964), 176 Ohio St. 61, 67. Although the reviewing court considers witness credibility, "a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to [] deference." *State v. Lawson* (August 22, 1997), Montgomery App. No. 16288. As we have said, "[t]his court will not arbitrarily substitute its judgment for that of the trier of fact on the issue of witness credibility, and will not do so at all unless it is patently apparent that the factfinder lost its way." *State v. Moshos* (Oct. 10, 1997), Greene App. No. 96-CA-140; *In re C.M.*, Montgomery App. No. 21363, 2006-Ohio-3741, at ¶41. Ferguson cites conflicts between Joseph's, Valnita's, Jermaine's, and Julius's testimony and that of experts. But we do not think that it is patently apparent that the jury should have believed the experts over the victims.

1. *Joseph's testimony*

{¶ 57} Joseph testified that he has a puncture-wound scar on his ribcage from a pen:

{¶ 58} "Q. Did you have any injuries on the front [of your body]?

{¶ 59} "A. Yes, well, I have one on my stomach from where James had stabbed me with a pen.

{¶ 60} "Q. And does that leave a scar as well?

{¶ 61} "A. Yes.

{¶ 62} "Q. And where is that located, you don't have to show us, just.

{¶ 63} "A. Right here (Indicating).

{¶ 64} "Q. Just indicating approximately mid rib cage?

{¶ 65} "A. Yeah, right there (Indicating)." (Tr. 1109-1110).

{¶ 66} The only scar on Joseph's chest that Dr. Scribano described was a triangular laceration scar, which Joseph told him was from being "whipped with a belt * * * by [his] mother," (Tr. 1275):

{¶ 67} "Q. * * * Doctor, what kind of–from examining that jurisdiction, was it a puncture wound? Was it a contusion? What was it?

{¶ 68} "A. So, it was a healed laceration, so the skin actually was lifted up causing a cut; but it's a V-shaped cut, so that's just being descriptive of the flap laceration. That's what we call that. The whipping is indicative of–of could be consistent and not uncommonly the buckle is the part of the belt that is striking a child to cause these kinds of open wounds. * * *" (Tr. 1276-1277).

{¶ 69} The testimony does not necessarily conflict. The jury could reasonably have thought that Joseph and Scribano were talking about two entirely different injuries. Joseph

does not say how big the scar is that he refers to or how visible it is. It is entirely possible that Dr. Scribano did not think that it was noteworthy enough to mention. Or the prosecutor may not have asked about the scar that Joseph was referring to.

2. *Valnita's testimony*

{¶ 70} Ferguson asserts that Valnita testified that Ferguson stabbed her leg with a stick, leaving a round scar, black in the middle:

{¶ 71} "Q. Do you have any other injury to your body other than marks?

{¶ 72} "* * *

{¶ 73} "A. Well, I don't remember what I did, but Vonda took the stick with the duct tape on it and she jammed it into my thigh and started twisting it around.

{¶ 74} "Q. And when it was twisted in your thigh, what happened to your thigh?

{¶ 75} "A. It got bloody. The mark is still there. It's–

{¶ 76} "Q. What kind of mark? What does it look like, what kind of mark are you talking about?

{¶ 77} "A. It's kind of like a hole in my leg. It's like round and it's black in the middle." (Tr. 1497).

{¶ 78} But neither examining expert mentioned such a scar. In her examination of Valnita, Dr. Applegate found two injuries on Valnita's thighs. She described one as "[a]n oblong circular area of dark discoloration on the top of the thigh," (Tr. 1022):

{¶ 79} "Q. And approximate size?

{¶ 80} "A. An inch.

{¶ 81} "Q. And were you able to deduce what type of injury that is?

{¶ 82} "A. That's a bruise.

{¶ 83} "Q. A bruise? Are you able to deduce the approximate time of that injury?

{¶ 84} "A. Perhaps a week." (Tr. 1022-1023).

{¶ 85} But Dr. Applegate also described a second injury on the back of Valnita's right thigh. She described it as "two circular, darkened areas, approximately 1 inch in diameter," (Tr. 1025):

{¶ 86} "Q. And what type of injury would cause such a mark?

{¶ 87} "A. These likely were the result of a contusion being hit with a solid, hard, round object, an inch in diameter.

{¶ 88} "Q. From examining these marks on the back of her right thigh, were you able to determine approximate time from your examination in November of '04 as to the time of these injuries?

{¶ 89} "A. No, I'm unable to date them." (Tr. 1025).

{¶ 90} Ferguson incorrectly asserts that Applegate described the round marks on Valnita's thighs as consistent with bruising, not stabbing. Dr. Applegate did not describe the second set of marks as bruises, like the first. The jury could have found Applegate's description consistent with Valnita's claim that Ferguson jabbed her thigh with a stick.

3. *Jermaine's testimony*

{¶ 91} Ferguson asserts that Jermaine testified that he has a scar on his chest from being repeatedly stabbed with a stick:

{¶ 92} "Q. And do you have scars on your body from being struck with [a] paddle?

{¶ 93} "A. From being struck.

{¶ 94} "Q. Or with [a] stick?

{¶ 95} "A. Yes, one time my mom actually stabbed me. I have a scar right here on my chest. She was beating me with a belt and the stick. It was late at night. We were supposed to be cleaning. This is when we lived in Marysville. We were supposed to be cleaning up. It was like 3 in the morning after church and we weren't moving fast enough; and I remember I fell like on top of this big white teddy bear and she began to take the jagged edge of the stick and repeatedly stab me; and my scar is right here. It's about this big.

{¶ 96} "* * *

{¶ 97} "Q. You showed that to the doctor at one point, right?

{¶ 98} "A. The doctor looked at it, yes. I didn't show it." (Tr. 1635-1636).

{¶ 99} Both Dr. Scribano and Dr. Applegate found a long scar on Jermaine's chest. They said that the scar was the result of a laceration, not a puncture. Dr. Applegate described a scar running up the middle of Jermaine's belly, "a little over 10 centimeters" long, (Tr. 994):

{¶ 100} "Q. * * * And looking at this mark on Jermaine Ferguson, were you able to draw an opinion as to the cause or–I mean is it a laceration, contusion, what kind of mark is it?

{¶ 101} "A. What he has is a scar called a keloid that is sustained by breaking the skin's surface. So it's a form of healing; and it's sharp, so we–it doesn't have jagged edges at all, so we actually do consider that to be a healed laceration." (Tr. 993-994).

{¶ 102} It is not patently clear that the jury lost its way considering the above testimony. Jermaine described Ferguson's actions as stabbing. But his testimony about the scar–"It's about this big"–suggests a long laceration scar. Jermaine did not say that his scar is

the result of a puncture wound. The jury could reasonably have believed that the stabbing action did not cause the stick to puncture Jermaine's skin in a single place but was rather dragged along the skin leaving the superficial laceration described by the experts and suggested by Jermaine's testimony.

4. *Julius's testimony*

{¶ 103}     Finally, Ferguson asserts that Julius testified that he has scars on his thighs and buttocks from beatings but Dr. Scribano did not mention any scars in those locations consistent with beatings. This was Julius's testimony:

{¶ 104}     "Q. Julius, as a result of being struck, do you have any marks on your body where you were hit?

{¶ 105}     "A. Yes.

{¶ 106}     "Q. And are they there today?

{¶ 107}     "A. Yes.

{¶ 108}     "Q. Can you tell the jury where they are, please?

{¶ 109}     "A. They are on the back of my thighs and on my behinds.

{¶ 110}     "Q. How have the scars–you've seen these scars?

{¶ 111}     "A. Yes.

{¶ 112}     "Q. How have they–what's happened to them over the years since you've left the Ferguson home?

{¶ 113}     "A. They've continued, as I grow, they stretch and it makes it–it's–they just stretch. They're still there." (Tr. 1359).

{¶ 114}     Dr. Scribano did not specifically mention scars on Julius's thighs and

behind. When the prosecutor asked Scribano if he recalled identifying any other marks or scars on Julius's body, he answered, "The only findings were that he had a skin problem, he had eczema that was pretty diffusely dry on his arms, legs, and on his chest. They were scaly, so just a moderate degree of eczema." (Tr. 1289).

{¶ 115} But Dr. Scribano did say that his examination of the four children revealed scarring on each of the children's thighs, backs, and buttocks that was consistent with physical abuse. The jury could reasonably have thought that Scribano was noting only particularly noteworthy findings that were in addition to the scars and bruises that he found on all the children.

## B. Corroborating physical evidence

{¶ 116} Ferguson contends that no physical evidence corroborates Joseph's and Sherita's claim that she shoved a plunger handle into their rectums or corroborates Joseph's testimony that he was hit in the teeth with a hammer. Ferguson is correct, but such corroboration is unnecessary in this case.

{¶ 117} Ferguson cites the rule from this court's opinion in *In re C.M.*, Montgomery App. No. 21363, 2006-Ohio-3741: "Where the State's case is so heavily dependent on the credibility of a child victim, the record should minimally demonstrate the child is not only credible, but competent." Id. at ¶41. The *C.M.* opinion noted that "[t]he fact finder's burden to assess the credibility of a young child is particularly important and arduous in sex abuse cases like this one, where the lack of physical evidence and eyewitness testimony necessitates a credibility contest." Id. at ¶44. In that case, the victim was 5 years old when he testified in support of a rape charge. This court found that the victim's testimony lacked

overall coherence. This court further found that there was a lack of substantial credible evidence and a complete lack of physical evidence. Moreover, in that case, there was no expert testimony that the child's behavior was consistent with abuse.

{¶ 118}     But the rule from *In re C.M.* does not apply here because the same concerns about the victim's testimony there do not arise here. Here, at the time of trial, none of the children was young–all were teenagers. Moreover, each child's testimony was coherent, and together their testimony was consistent. Finally, psychological experts, who had examined the children, testified that their behavior was consistent with abuse.

{¶ 119}     The third assignment of error is overruled.

## V.

{¶ 120}     In the fourth assignment of error, Ferguson alleges that the trial court erred by limiting defense counsel's cross examination of Valnita. Specifically, Ferguson points to the court's decision not to allow counsel to ask her about specific instances when she allegedly lied. We find no error.

{¶ 121}     During defense counsel's cross examination of Valnita, the following exchange occurred:

{¶ 122}     "Q. Val, do you tell lies?

{¶ 123}     "A. Yes.

{¶ 124}     "Q Do you tell lies often?

{¶ 125}     "A. No.

{¶ 126}     "Q. You understand when you're put on the stand and raise your right hand and put under oath, it's an oath to tell the truth, right?

**{¶ 127}** "A. Yeah.

**{¶ 128}** "Q. Do you remember when you stayed with Paulette Robinson, one of your former foster mothers?

**{¶ 129}** "A. Yes.

**{¶ 130}** "Q. Do you remember telling Miss Robinson?

**{¶ 131}** "[PROSECUTOR]: Object, Your Honor." (Tr. 1531-1532).

**{¶ 132}** The judge asked counsel to approach the bench:

**{¶ 133}** "THE COURT: What is the prior statement you're trying to get?

**{¶ 134}** "[DEFENSE COUNSEL]: I was just gonna ask her if she remembered telling Miss Robinson, and I've got four or five different events, and ask her if she recalls what she said and what she did say.

**{¶ 135}** "THE COURT: Are these questions she's already answered on examination?

**{¶ 136}** "[DEFENSE COUNSEL]: No.

**{¶ 137}** "THE COURT: Then you have to put them into present tense first. Are you gonna say, 'Did you tell Miss Robinson?' You have to ask her the question about X and if she doesn't, if she says something different than she told Miss Robinson, then ask her about Miss Robinson.

**{¶ 138}** "* * *

**{¶ 139}** "THE COURT: Prior specific incidents she's already testified that she has lied, so I will–I will sustain the objection. You can't go into the prior specific incidents of her lying. She's already testified that she lies or has lied." (Tr. 1532-1534).

{¶ 140}     The trial court's ruling appears to rest on the fact that, because Valnita admitted that she has lied, specific instances of lying need not be inquired into. Had she denied lying, the court probably would have allowed the inquiry. See (Tr. 1537).[7]

{¶ 141}     Defense counsel described six instances of alleged lying that he wanted to ask Valnita about:

{¶ 142}     "[Valnita] told Paulette Robinson that she won $20 playing bingo. She put the $20 on her lunch account at school. She went to buy the lunch, and there was no money on the account; and the truth of the matter is that she found $20 at home in the washer. She never put it on her lunch account." (Tr. 1535).

{¶ 143}     "She told Miss Robinson she got kicked off the basketball team for getting in trouble in a fight with the other players, and the truth is she never was on the basketball team and the coach doesn't know who she is." (Tr. 1535).

{¶ 144}     "She went to school and told her friends at school she had a baby. She even showed her friends at school a picture of the baby. The truth is she never had a baby." (Tr. 1535).

{¶ 145}     "She lied about using Paulette's decorative towels." (Tr. 1535).

{¶ 146}     "She lied about saying she was never fed or not fed by the baby-sitter when that, in fact, was not true." (Tr. 1535).

{¶ 147}     "She says she was harassed by a guest in Paulette's home. That also was

---

[7]"[DEFENSE COUNSEL]: * * * [W]e * * * have a witness to testify about all these lies that she [Valnita] told Miss Robinson. We subpoenaed her. She did show up here on November the 3[rd] and she was ordered to come back in court. So the person that she told these things to also testify in this case [sic], and I think that's clearly probative.

not true." (Tr. 1535-1536).

{¶ 148}     Ferguson argues that by preventing counsel from asking about these instances the trial court abused its discretion under Evid.R. 608 and violated two provisions in the Sixth Amendment to the U.S. Constitution.

## A. Evidence Rule 608

{¶ 149}     Evid.R. 608(B) states when specific instances of a witness's conduct may be admitted to attack or support the witness's veracity:

{¶ 150}     "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness * * * may * * *, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness * * * concerning the witness's character for truthfulness or untruthfulness * * *."

{¶ 151}     The Supreme Court of Ohio has said that "[c]ross-examination of a witness is a matter of right, but the 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" *State v. Green* (1993), 66 Ohio St.3d 141, 147, quoting *Alford v. United States* (1931), 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624. "A trial court abuses its discretion when it unduly limits cross-examination of the victim, on an issue affecting credibility, when the victim's testimony is vital to the state's case." *State v. Carlson* (1986), 31 Ohio App.3d 72, 73, citing *State v. Ferguson* (1983), 5 Ohio St.3d 160, 166.

{¶ 152}     Here, the trial court's decision to exclude specific-instance evidence

---

"THE COURT: If it's an issue. But she's already testified that she lies." (Tr. 1537).

was not an abuse of its discretion. These alleged instances of lying are entirely unrelated to the issues in this case. Furthermore, it is not at all clear that these specific lies are probative of Valnita's untruthfulness about the abuse she described.

## B. The Sixth Amendment

{¶ 153} The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * * and to have the Assistance of Counsel for his defence." Ferguson contends that the trial court violated both of these provisions.

{¶ 154} Generally, "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa* (1988), 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857. But the U.S. Supreme Court has said that "[c]onfrontation means more than being allowed to confront the witness physically." The Court has held that "'a primary interest secured by it [the Confrontation Clause] is the right of cross-examination.'" *Davis v. Alaska* (1974), 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347, quoting *Douglas v. Alabama* (1965), 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934.

Here, by preventing defense counsel from asking about these six collateral instances of alleged prevarication, the trial court did not so limit the cross examination that Ferguson's right was infringed.

{¶ 155} Ferguson further contends that, by curtailing defense counsel's cross examination, the trial court violated her right to representation by counsel and her right to effective assistance of counsel. Ferguson asserts that the trial court violated her right to counsel by leaving her without counsel capable of performing the critical function of cross

examination. The "right [to counsel] was designed to assure fairness in the adversary criminal process [because] * * * an unaided layman may have little skill in arguing the law or in coping with an intricate procedural system." *Wheat v. U.S.* (1988), 486 U.S. 153, 158, 108 S.Ct. 1692, 100 L.Ed.2d 140. Accordingly, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process.'" Id. at 159, quoting *U.S. v. Cronic* (1984), 466 U.S. 648, 657, n.21, 104 S.Ct. 2039, 80 L.Ed.2d 657. The trial court's exclusion here does not at all intrude upon the adversarial process. Ferguson states in her brief that her ineffectiveness claim is based on the trial court's ruling, "not [on] * * * any error or misjudgment attributable to defense counsel." Brief of Appellant, p.24. "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson* (1970), 397 U.S. 759, 771 n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763. To show that this latter right was violated, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Because counsel's representation is not the basis of this ineffectiveness claim, it must be rejected.

{¶ 156}     The fourth assignment of error is overruled.

{¶ 157}     We have overruled each assignment of error presented. Therefore the judgment of the trial court is affirmed.

. . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

David W. Phillips
Stephen D. Marlowe

Hon. Richard J. O'Neill