[Cite as *State v. Evans*, 2017-Ohio-8184.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

STATE OF OHIO                              :
                                           :
    Plaintiff-Appellee                 :      Appellate Case No. 27178
                                           :
v.                                         :      Trial Court Case No. 15-CR-1084
                                           :
DIONTE EVANS                               :      (Criminal Appeal from
                                           :       Common Pleas Court)
                                           :
    Defendant-Appellant                :
                                           :

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of October, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

DAVID J. FIERST, Atty. Reg. No. 0043954, 2533 Far Hills Avenue, Dayton, Ohio 45419
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, P.J.

{¶ 1} Dionte Evans appeals from his conviction and sentence on one count of felony murder in connection with the death of his girlfriend's young son.[1]

{¶ 2} Evans advances six assignments of error. First, he contends judicial bias deprived him of due process during his jury trial. Second, he claims the trial court erred in declining to suppress statements he made to a corrections officer while being booked into jail. Third, he asserts that the trial court erred in denying a motion he made under *Batson v. Kentucky*, 476 U.S 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), during jury selection. Fourth, he argues that the trial court erred in permitting a deputy coroner to testify as an expert regarding the cause of the child's death. Fifth, he maintains that the trial court erred in overruling his Crim.R. 29 motion for acquittal. Sixth, he challenges the jury's verdict as being against the manifest weight of the evidence.

{¶ 3} The present appeal stems from events that occurred on April 8, 2015 inside an apartment Evans shared with his girlfriend, Bernette Lewis, and her 21-month old son. Early that morning, Lewis left Evans alone with the child when she went to work. Around 2:00 p.m., Evans' friend, Marquay Cook, arrived at the apartment. Almost immediately after Evans let him in, Cook observed the child walk around a corner, stumble, and hit his head on a wall. The child then stood up and fell back down on his head. According to Cook, Evans claimed the child was just playing and splashed a little water on him. The child made a gasping sound but otherwise showed little response. Evans then picked up the child, who appeared to have passed out. Just then, Lewis returned home from work

---

[1] A jury also found Evans guilty on other related charges, which the trial court merged into the felony-murder conviction as allied offenses of similar import for purposes of sentencing.

and called an ambulance. Lewis testified at trial that the child's eyes were "rolled back" and he was breathing heavily. Police arrived and performed CPR before carrying the child out to a paramedic. At that point, the child appeared "totally lifeless." He was not breathing and had no pulse. CPR was continued while the child was transported to the hospital. Resuscitation efforts continued at the hospital for approximately 20 minutes without success. The child showed no signs of life and was pronounced dead.

{¶ 4} A subsequent autopsy established the cause of death as "blunt force trauma to the torso." Deputy county coroner Bryan Castro testified that the child had other non-life-threatening injuries including bruises at various locations and a broken rib that had started to heal before recently having been broken again. With regard to the injury that caused death, Castro testified that the child's liver exhibited multiple tears or lacerations that had resulted in significant internal bleeding. In particular, nearly half of the blood in the child's body had leaked into his abdominal cavity. Castro opined that the injury to the liver and the resulting blood loss was the "main lethal injury." He explained that a child's liver is "fairly tough in comparison to an adult liver" and not easy to lacerate. In addition to the liver injury, Castro noted bruising to the child's pancreas, diaphragm, and intestine. According to Castro, a significant loss of blood might result in a loss of balance and "stumbling around." He stated that a person suffering from the internal injuries the child experienced would exhibit symptoms "very quickly, if not immediately[.]" Castro also opined that the child's internal injuries were the type seen in car accidents or falls from significant heights. Finally, he testified that the child had some bruising on the forehead, but no head injuries that would have led to death.

{¶ 5} Bernette Lewis testified that Evans told her the child had hit a wall while

playing hide-and-seek with him. When an officer at the scene asked what had happened, Evans similarly responded that the child ran around a corner and hit his head while they were playing hide-and-seek. When questioned by a detective at the police station after the incident but before any autopsy results were known, Evans again reported that the child had hit a wall while they were playing. On that occasion, Evans never admitted striking the child in any way. During a subsequent interview, however, Evans' story changed when he was confronted with autopsy results showing no significant head injury, but severe abdominal injuries. Toward the end of the interview, Evans admitted that he had been play fighting with the child when he punched him and he fell. Evans denied trying to cause harm. Shortly thereafter, he was arrested and taken to jail.

{¶ 6} At the jail, Evans interacted with Marcus Raiff, a receiving officer whose responsibilities included intake processing. Raiff performed a pat-down and then began asking a series of questions that he asks all incoming jail inmates. The first question, Raiff testified, was "I asked him what his charges were." (Suppression Tr. at 67). Evans responded: "Man, I had killed my son."[2] Raiff then asked, "What happened?" Evans responded: "I punched him in the chest, caused internal bleeding." He added: "When they let me go I should have ran back to Chicago." While in jail, Evans also interacted with a jail paramedic, Jordan Jeffries, who performed medical-intake screening. During that process, Jeffries discovered that Evans recently had come to Dayton from Chicago. He asked what Evans was doing in jail if he had just arrived in town. Evans responded that he had "accidentally killed his son and that's why he was in jail."

---

[2] Although the child was not Evans' biological or adopted son, the record reflects that he referred to the child as his son.

{¶ 7} A jury found Evans guilty on multiple charges related to the child's death. They included felony murder, involuntary manslaughter, and two counts of child endangering. The trial court merged all of the counts into the felony-murder count as allied offenses for purposes of sentencing. It then imposed a sentence of 15 years to life in prison. This appeal followed.

{¶ 8} In his first assignment of error, Evans contends judicial bias deprived him of his due-process right to a fair trial. His primary argument is that the trial court on a Monday told the jury several times that its goal was to proceed expeditiously and to finish the case by Thursday. Evans also cites the trial court's evidentiary ruling on a suppression issue, which we will discuss below, as evidence of judicial bias. Finally, Evans sees evidence of judicial bias in the trial court allowing the State to exercise a peremptory challenge on a potential juror, an issue we also will address more fully below.

{¶ 9} In response to Evans' assignment of error, the State insists that his only remedy if he thought judicial bias existed was to seek disqualification of the trial court judge in the Ohio Supreme Court. Alternatively, the State argues that the record does not reflect judicial bias.

{¶ 10} Upon review, we find Evans' first assignment of error to be unpersuasive. Assuming arguendo that the issue properly is before us,[3] we find no evidence of judicial

---

[3] We lack authority to determine whether a trial court judge should be disqualified for bias or should recuse himself. Some courts have recognized a distinction, however, where the question is not prospective disqualification or recusal but whether the judge's conduct during trial deprived the defendant of his due process rights. *See, e.g., State v. Payne*, 149 Ohio App.3d 368, 2002-Ohio-5180, 777 N.E.2d 333, ¶ 11 (7th Dist.); *State v. Smetana*, 9th Dist. Lorain No. 12CA010252, 2013-Ohio-2376, ¶ 22-23 (Carr, P.J., concurring).

bias.

{¶ 11} " '[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law.' * * * Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " (Citations omitted) *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 48.

{¶ 12} We see nothing in the trial court's stated goal of finishing the case within the week that is indicative of bias or favoritism either toward the State or against Evans. The record does not support the notion that haste, if any existed, deprived either party of due process. We reach the same conclusion with regard to his claims about the trial court's suppression ruling and its allowing of a peremptory challenge. As we will explain more fully below, the trial court's ruling on the peremptory challenge was not objectionable. Although the suppression ruling presents a closer question, we find nothing to suggest that either ruling was the result of bias. *See In re Disqualification of Hurley*, 113 Ohio St.3d 1228, 2006-Ohio-7229, 863 N.E.2d 630, ¶ 4 ("Although some judicial decisions can be challenged on appeal, a party's disagreement or dissatisfaction with a court's rulings of law, without more, does not demonstrate bias or prejudice."). We do not see evidence of judicial bias, Evans has not established judicial bias, and therefore he cannot demonstrate that judicial bias deprived him of his due process right to a fair trial. The first assignment of error is overruled.

{¶ 13} In his second assignment of error, Evans claims the trial court erred in

declining to suppress incriminating statements he made to Officer Raiff while being booked into jail on April 9, 2015. During the suppression hearing, Raiff admitted not administering *Miranda* warnings before questioning Evans as part of the intake process. In the course of routine booking, Raiff asked what Evans' charges were. As set forth above, Evans responded that he had killed his son. (Suppression Tr. at 68). This response shocked Raiff, who followed up by asking "what happened." (*Id.*) Raiff said, "[i]t was more just a curiosity question to see whether I needed to isolate him or not for his safety." (*Id.*). Evans responded to this question by stating that he had punched the child in the chest and caused internal bleeding and that he should have "ran back to Chicago." (Tr. Vol. II at 431).

{¶ 14} In the trial court, Evans had challenged the admissibility of several of his statements, arguing that they were the product of custodial interrogation without *Miranda* warnings. The trial court disagreed. It began by finding that Evans' on-the-scene statements to Officer Harlow on April 8, 2015 about the child hitting his head while playing hide-and-seek were not objectionable, despite the lack of *Miranda* warnings, because Evans was not in custody and the officer simply was trying to process the scene and figure out what had happened. With regard to Evans' interview at the police station by Detective Gebhart later that day, the trial court noted that he properly had been *Mirandized* before he made his statements about the child hitting his head while playing. The trial court next turned to Evans' April 9, 2015 interview by Detective Gebhart at the police station after autopsy results had been obtained. On that occasion too Evans waived his *Miranda* rights and admitted punching the child in the abdomen or chest, knocking him down, while purportedly play fighting. After making these statements, Evans was

arrested and transported from the police station to jail by Officer Harlow. During the ride, Officer Harlow engaged in questioning that the trial court found was likely to elicit (and did elicit) incriminating responses. The trial court found these statements by Evans subject to suppression, reasoning that the prior *Miranda* warnings given by Detective Gebhart no longer were in effect. The trial court found new *Miranda* warnings required because "the interrogations took place in different locations and were conducted by different individuals." Therefore, the trial court reasoned that Officer Harlow was required to give Evans a *Miranda* warning before beginning the questioning of him. (Doc. #30 at 9).[4]

{¶ 15} Finally, with regard to the statements Evans made to booking officer Raiff and jail paramedic Jeffries, the trial court reasoned:

Evans did not make any incriminating statements as a result of a custodial interrogation that would have resulted in a violation of his constitutional rights while being booked at the Montgomery County Jail. C.O. Raiff did not interrogate Evans. The questions asked by C.O. Raiff were not reasonably likely to elicit an incriminating response about the incidents leading up to the death of the child. Rather, the questions asked by C.O. Raiff were general fact-finding questions to determine whether any

---

[4] In this regard we note that Officer Harlow was not a stranger to Evans. Harlow had responded to the original call, had spoken with Evans, transported him to the police station and later took Evans to the hospital that day. Harlow also drove Evans and the child's mother to the police station for the August 9th detective interview. Although we might disagree with the trial court's conclusion that new or additional *Miranda* warnings were required by Officer Harlow when transporting Evans to the jail shortly after the detective's interview, where Evans had been advised of his *Miranda* rights for the second time, that specific ruling is not the subject of this appeal.

special precautions were needed for Evans in jail. Since there was no interrogation, C.O. Raiff did not need to give Evans his *Miranda* warnings. Therefore, the Court finds there was no violation of Evans' constitutional rights and overrules Evans' Motion to Suppress as related to the April 9, 2015 statements made to C.O. Raiff during the booking at the Montgomery County Jail.

Evans did not make any incriminating statements as a result of custodial interrogation that would have resulted in a violation of his constitutional rights while being interviewed by Mr. Jeffries. Mr. Jeffries was not acting at the direct behest or control of a law enforcement official when he questioned Evans. The questioning occurred during the course of Mr. Jeffries' ordinary job as a paramedic. The questions asked by Mr. Jeffries were not reasonably likely to elicit an incriminating response about the incidents leading up to the death of the child since the questions were general questions related to the booking process, such as why Evans was in jail.

(Doc. # 30 at 9-10).

**{¶ 16}** On appeal, Evans challenges only the aspect of the trial court's suppression ruling dealing with intake officer Raiff's questioning. Specifically, he claims Raiff's purported booking questions were not related to jail safety. He reasons that asking "what happened" is pure classic interrogation reasonably likely to elicit incriminating information. Evans also points out that Raiff presumably had other ways to determine why he had been arrested. Therefore, he contends the trial court erred in failing to suppress his un-

*Mirandized* statements to Raiff.

{¶ 17} Upon review, although we agree in part with Evans' argument, we find Evans' second assignment of error to be unpersuasive. As a threshold matter, we do not believe Raiff needed to advise Evans of his *Miranda* rights again, even if we accept that Raiff's questioning constituted traditional custodial interrogation. As set forth above, Evans was *Mirandized* by Detective Gebhart at the police station on April 8, 2015 and April 9, 2015. On both occasions, Evans waived his rights and spoke with the detective. The April 9, 2015 interview video (State's exhibit 44) indicates it ended around 4:30 p.m. when Officer Harlow appeared in the interview room to transport Evans to the jail, where Evans interacted with intake officer Raiff somewhere "between 5:00 and 7:00 p.m.", although "probably around 7:00." (Suppression Tr. at 72). Even if Evans waived his *Miranda* rights with Detective Gebhart in the early afternoon and was not questioned by Raiff until 7:00 p.m., only a little more than five hours elapsed between Evans' waiver of his rights and his responses to Raiff's questions. Under these circumstances, we do not believe Raiff was required to re-*Mirandize* Evans even if we were to conclude that the rules governing custodial interrogation applied to the booking questioning.

{¶ 18} "Police are not required to readminister *Miranda* warnings to a suspect when a relatively short period of time has elapsed since the initial warnings." *State v. Powell*, 132 Ohio St.3d 233, 2012–Ohio–2577, 971 N.E.2d 865, ¶ 119. In *Powell*, the Ohio Supreme Court recognized that lapses of time greater than 24 hours do not necessarily make prior *Miranda* warnings stale. *Id.* at ¶ 120. Other relevant factors, however, include whether the warnings and subsequent interrogation were given in different places, whether they were conducted by different officers, the extent to which

the subsequent statement differed from previous statements, and the apparent intellectual and emotional state of the defendant. Here the prior warnings by Detective Gebhart occurred at the police station, and Evans' statements to Raiff occurred at the jail. The statements also were provided to two different law-enforcement officials. On the other hand, Evans' statements to Gebhart and Raiff did not differ much. Evans told Gebhart that he had struck the child in the chest knocking him down while play fighting, although he downplayed the intensity. In his statement to Raiff later that day, Evans reported that he had killed the child by punching him in the chest and causing internal bleeding. We also see nothing about Evans' apparent intellectual and emotional state that would necessitate re-administering *Miranda* warnings. Under the totality of the circumstances before us, we are unconvinced that Raiff was required to re-administer *Miranda* warnings before talking to Evans about the case even if we accept, arguendo, that the normal rules governing custodial interrogation apply.

{¶ 19} In any event, we note too that a routine-booking-question exception to the need for *Miranda* warnings applies. In *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 32, the Ohio Supreme Court recognized that "the requirement that police administer *Miranda* warnings before questioning a suspect in custody does not apply to routine booking questions." The *Hale* court noted that routine booking questions generally involve biographical data and personal-history information routinely requested for record-keeping and administrative purposes. *Id*. at ¶ 33, quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), quoting *United State v. Horton*, 873 F.2d 180, 181, fn.2 (8th Cir.1989).

{¶ 20} Here we conclude that Raiff's question "I asked him what his charges were,"

(Suppression Tr. at 67), qualified as a routine booking question. Although the question was not narrowly "biographical" in nature, Raiff explained that he asked the question of all incoming inmates to process them into the jail properly and to determine whether they needed to be segregated from other prisoners or jail staff for security reasons. This rationale is consistent with ensuring the jail's orderly administration. We note too that the question does not appear to have been intended or expected to elicit an incriminating response. Raiff asked only what Evans charges were, not what he actually had done. Under these circumstances, Evans' unexpected response that he had killed his son was admissible under the routine-booking-question exception to the need for *Miranda* warnings even assuming, arguendo, that the prior warnings given by Detective Gebhart hours earlier were stale and no longer effective.

{¶ 21} Finally, we disagree with the trial court that Raiff's follow-up inquiry about "what happened" when Evans killed the child qualifies as a routine booking question. Asking Evans what happened when he killed the child was classic interrogation about the facts and circumstances surrounding the crime. It was precisely the type of question a detective might ask a suspect in an interrogation room. As noted above, however, we conclude that *Miranda* warnings were not required before Raiff asked the question because Evans already had waived his *Miranda* rights, for the second time in two days, several hours earlier at the police station. Therefore, on this record we see no basis for suppressing Evans' response when Raiff asked him what happened although it does not qualify as a booking question.

But even if Evans is correct and his response when asked "what happened" should have been suppressed, we would find harmless error under the facts of this case. As set

forth above, Evans responded that he had punched the child in the chest and caused internal bleeding and that he should have gone back to Chicago. Notably, Evans made similar statements (minus the Chicago reference) to other prosecution witnesses whose trial testimony he does not challenge on appeal. First, the State played a video at trial of Evans' interview with Detective Gebhart wherein Evans admitted punching the child in the stomach or chest and knocking him down while purportedly play fighting. (Trial transcript at 517). Second, the State presented the testimony of jail paramedic Jeffries, who performed medical intake screening. Evans admitted to Jeffries that he had "accidentally killed his son and that's why he was in jail." These two statements by Evans, which were admitted at trial and are not challenged on appeal, taken together constitute an admission that he caused the child's death by punching him in the chest. Although Evans asserted that the child's internal injuries were accidental, the medical evidence— particularly deputy coroner Castro's testimony—overwhelmingly refutes that claim. Castro testified that the child's liver exhibited multiple tears or lacerations that had resulted in significant internal bleeding. He explained that the force required to produce these injuries was consistent with a car accident or a fall from a substantial height. Because Evans made largely the same admissions to Gebhart and Jeffries that he made in response to Raiff's question about "what happened," and because the medical evidence overwhelmingly refutes his claim of an accidental injury, we would find harmless error in the trial court's admission of Evans' response to Raiff's "what happened" question. For all of the foregoing reasons, the second assignment of error is overruled.

{¶ 22} In his third assignment of error, Evans claims the trial court erred in allowing the State to use a peremptory challenge to remove an African-American prospective juror

during voir dire. Evans argues that exercising the peremptory challenge violated *Batson* because the prosecutor did not provide a race-neutral reason for striking the prospective juror.

**{¶ 23}** In *Batson*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the U.S. Supreme Court established a three-part test for determining whether a prosecutor's use of a peremptory challenge should be denied because of racial motivation. First, the defendant must make a prima facie showing of a race-based peremptory challenge. Second, the prosecutor must offer a race-neutral reason for striking the potential juror. Third, the trial court must determine whether the defendant has proven purposeful discrimination. This requires determining whether the prosecutor's race-neutral explanation is credible or whether it is a pretext for unlawful racial discrimination. *State v. Greene*, 2d Dist. Montgomery No. 24307, 2011-Ohio-4541, ¶ 6-9, quoting *Batson*.

**{¶ 24}** Evans' argument here involves the State's peremptory challenge to prospective juror Starks. (Tr. Vol. I at 168). Defense counsel objected, claiming there was no race-neutral reason for removing Starks, who was black. (*Id.* at 169). While noting that a prima facie showing under *Batson* requires something more than the bare fact that the prosecutor struck a black prospective juror, the trial court nevertheless asked the prosecutor to provide a race-neutral reason for the strike. (*Id.* at 169-170). The prosecutor responded:

> Quite frankly, there were numerous reasons that I'm prepared to put
> on the record. One is [Starks'] physical health. He indicated to us fairly early
> in the voir dire that he's diabetic and requires medication. That medication—
> he was worried about the effects that it would have on him throughout the

-15-

process here. In fact, what scared me was he wasn't sure what the effects would be if he didn't get his medication, which he said he did not even bring with him today.

That aside, he also indicated to us that he does have a tendency to nod off. That gave me concern for his ability to really be an attentive juror throughout this process.

The facts is—also more concerning is the fact that our office—the Montgomery County Prosecutor's Office—prosecuted his nephew several years ago. That always calls into concern his ability to be fair and impartial when the State, who is prosecuting this case, prosecuted a close member of his own family.

And so for those three race-neutral reasons, we would ask that he be excused.

I'd also like the record to reflect that, yes, he's African-American, as is the defendant, but also the victim in this is also African-American and there are other African-Americans still out in the jury pool.

(*Id.* at 171-172).

**{¶ 25}** When given an opportunity to rebut the prosecutor's reasons for the peremptory strike, defense counsel demurred, stating: "I've got nothing else to add, Judge." (*Id.* at 172). The trial court then overruled the *Batson* challenge and allowed the peremptory strike, reasoning:

All right. I find, at this point, that the defendant has not made a prima facie showing that the prosecutor has exercised the peremptory challenge

of Mr. Stark[s] based on race.

I overrule the Batson challenge. Mr. Amos has articulated three reasons that could very well be viewed independently as sufficient basis, sitting in his shoes, and exercising a peremptory challenge to excuse Mr. Stark[s]. * * *

(*Id.*).

**{¶ 26}** On appeal, Evans first discusses the questioning of another person, prospective juror Crawford, who is not the subject of the peremptory challenge at issue. The trial court overruled defense counsel's own for-cause challenge to Crawford, rejecting counsel's argument that she could not be fair and impartial. Crawford's situation has no relevance to the issue before us, which is whether the prosecutor articulated race-neutral reasons for striking prospective juror Starks. On that issue, Evans contends Starks indicated that he could stay awake. Evans also contends the State failed to ask any "follow-up" questions when another prospective juror explained that he would need restroom breaks. For these reasons, Evans insists "that the State could not provide a race-neutral basis for excluding Mr. Starks from the jury venire." (Appellant's brief at 18).

**{¶ 27}** Upon review, we see no error in the trial court's *Batson* ruling. The prosecutor's articulation of multiple race-neutral reasons for the peremptory strike renders moot whether Evans established the first step of a prima-facie case. *State v. Ferguson*, 2d Dist. Clark No. 2010-CA-1, 2011-Ohio-6801, ¶ 47. With regard to the prosecutor's race-neutral explanation, it was more than adequate. Starks conceded that he had difficulty staying awake because of his medication. (Tr. Vol. I at 26). When asked by the trial court whether taking occasional breaks would enable him to stay awake, Starks

responded, "Yeah." (*Id.* at 27). Although this response may have prevented a for-cause challenge, the prosecutor reasonably could have had lingering concerns about Starks' alertness. In any event, the prosecutor's concerns about Starks' medication and its effects constituted race-neutral reasons for removing him. Finally, the fact that one of Starks' relatives had been prosecuted in Montgomery County was an additional race-neutral reason that Evans has not even addressed on appeal. Accordingly, the third assignment of error is overruled.

{¶ 28} In his fourth assignment of error, Evans contends the trial court erred in permitting deputy coroner Castro to testify as an expert regarding the cause of the child's death. Evans' only argument in support is that Castro lacked certification by any medical board.

{¶ 29} We find Evans' argument to be unpersuasive. Castro testified that he had worked as a deputy coroner and forensic pathologist for approximately 14 years. (Tr. Vol. II at 227). Prior to that, he obtained a medical degree and completed a four-year residency in general pathology. He also completed a two-year fellowship in forensic pathology. (*Id.* at 228). He belonged to two professional medical organizations and had been published in the medical field. (*Id.* at 228-229). Castro personally had performed almost 4,000 autopsies and had supervised or assisted with several hundred more. (*Id.* at 230). He previously had been recognized as an expert in forensic pathology and had testified as an expert in multiple Ohio counties, in Indiana, and in federal court. (*Id.* at 231).

{¶ 30} Contrary to the implication of Evans' argument, board certification is not required to qualify a witness as a medical expert. *Swift v. Allied Pest Control, Inc.*, 2d Dist. Montgomery No. 18311, 2001 WL 992051, *7-8 (Aug. 31, 2001), citing *State v. Baston*,

85 Ohio St.3d 418, 423, 709 N.E.2d 128 (1999); *see also State v. Chukes*, 5th Dist. Delaware No. 02CA-F-01-007, 2002 WL 1489565, *2 (July 10, 2002) ("The fact that [the witness] is not a board certified pediatrician does not render her unqualified to render an expert medical opinion, but rather goes to the weight to be given the evidence."). We see no error in the trial court's decision to accept Castro as an expert witness notwithstanding his lack of board certification. The fourth assignment of error is overruled.

{¶ 31} In his fifth and sixth assignments of error, Evans challenges the legal sufficiency and manifest weight of the evidence to sustain the jury's verdict. His arguments in support are that the trial court erred in (1) allowing Castro to testify as an expert witness regarding the child's cause of death and (2) pressuring the parties "hastily" to conclude the trial in three days. Evans asserts that but for the error in allowing Castro to testify as an expert there would be legally insufficient evidence to convict him of murder. He then asserts that the jury lost its way, and reached a verdict against the weight of the evidence, because of the trial court's haste in conducting the trial.

{¶ 32} When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471, 741 N.E.2d 594 (2d Dist.2000). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v.*

*Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 33} Our analysis is different when reviewing a manifest-weight argument. When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 34} With the foregoing standards in mind, we find Evans' fifth and sixth assignments of error to be unpersuasive. When analyzing the legal sufficiency of the evidence, we must consider all of the evidence admitted below, regardless of whether Evans believes it should have been excluded. *State v. Nelson*, 2d Dist. Montgomery No. 25026, 2012-Ohio-5797, ¶ 17. In any event, Castro's testimony properly was admitted despite his lack of board certification. As for the trial court's alleged haste, the record does not reflect that it pressured the parties or the jury in any way. The trial court simply told the jury that its goal was to proceed expeditiously and to finish the case in three days.

{¶ 35} Finally, the evidence amply supports Evans' guilt. The 21-month-old child at issue was left alone in Evans' care. Evans admitted that no one else was present at the time that the massive internal injuries must have occurred. He initially claimed the child had hit his head while playing hide-and-seek. After being confronted with autopsy

results that showed significant internal injuries but no meaningful head injury, Evans admitted striking the child in the abdomen. Although he professed to have been play fighting, the nature and severity of the child's internal injuries overwhelmingly support a finding that those injuries were not accidental and were not the result of play fighting. The State's evidence, if believed, was legally sufficient to convince the average mind of Evans' guilt. The jury also did not clearly lose its way in convicting Evans, as this is not an exceptional case in which the evidence weighs strongly against conviction. Accordingly, the fifth and sixth assignments of error are overruled.

{¶ 36} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., concurring:

{¶ 37} I agree that booking officer Raiff's question "what happened" does not fall within the booking exception to *Miranda* and that it is not related to a legitimate administrative function or concern. I write separately to emphasize that the booking exception must be drawn as narrowly as possible. Thus, in my view, Raiff's initial question regarding Evans' charges was not a legitimate booking question either. It was a direct reference to the offense(s) for which Evans' had been arrested. In fact, the record establishes that Evans was not advised of the charges against him. Specifically, during direct examination by the plaintiff's attorney, Detective Gebhart testified:

Q. And the - - - at that time then you made a decision to arrest him?

A. Yes.

Q. Was he informed what he was arrested for?

A.    Not specifically because until we meet with you folks, we don't know specifically.   (Tr. pg. 54, line 12-17).

**{¶ 38}** This illustrates just how nonsensical it would be for a receiving officer to determine from an arrestee the nature of his charges.   It certainly does not seek biographical data such as age, name, date of birth, social security number, height or weight.

**{¶ 39}** Inquiring about the charges and what happened does relate to the criminal activity even more than tangentially.   As noted in *United States v. Avery*, 717 F.2d 1020, 1024, (6th Circ. 1983), the Sixth Circuit emphasized "courts should carefully scrutinize the factual setting of each encounter of this type.   Even a relatively innocuous series of questions, may in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." (Citation omitted.)

**{¶ 40}** Accordingly, I would find the trial court should have suppressed all incriminating statements made to corrections officer Raiff by Evans, but nevertheless agree with the majority, on this record, it is harmless error.


Copies mailed to:

Mathias H. Heck
Andrew T. French
David J. Fierst
Hon. Michael W. Krumholtz